# WARD v. WILBANKS, ET AL

# PERRY CLARK FRANCIS

December 17, 2009

*Prepared for you by*



**Bingham Farms** | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE: 248.644.8888   FAX: 248.644.1120

www.bienenstock.com

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JULEA WARD,

                    Plaintiff,

          vs.                    Case No. 2:09-cv-11237-GCS-PJK

                                 Hon. George Caram Steeh

ROY WILBANKS, et al.,

                    Defendants.

_____



        The Deposition of PERRY CLARK FRANCIS,

        Taken at 101 North Main Street, Seventh Floor

        Ann Arbor, Michigan,

        Commencing at 2:17 p.m.,

        Thursday, December 17, 2009,

        Before Leisa M. Pastor, CSR-3500, RPR, CRR.



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

Pl.'s MSJ Ex. 25 - 240

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 37

1       situations where, perhaps, concerns were raised, but

2       they weren't sufficient enough to warrant an informal

3       review process?

4   A.  That would be correct.

5   Q.  So, with those students, they would still be approved

6       for practicum?

7   A.  Yes.

8   Q.  Or would someone just be outwardly denied?

9   A.  Let's say professor A brings up a concern about

10      student Z, Professor B, C, and D say we have not seen

11      this behavior, or it's by been my experience this

12      student has demonstrated these skills very well in

13      this particular course.  That may satisfy Professor A

14      that what they were seeing did not rise to the level

15      to deny a student admission into practicum.

16  Q.  Is a student ever denied for practicum without going

17      to an informal review conference?

18  A.  A student, if they're denied for practicum,

19      immediately go to an informal review.

20  Q.  How many clients, on average, do you get each -- each

21      semester at the counseling clinic?

22  A.  In the fall, and winter, if we have 15, a full

23      contingent of 15 clinicians, or clinicians in

24      training, each clinician will start the first week

25      with one, and then continue on and then build up.  So,



Pl.'s MSJ Ex. 25 - 241

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 38

1    I couldn't give you an accurate number, because they

2    come and go, and sometimes a client might stay for the

3    full 15 weeks and sometimes not.  It's not a number

4    that I regularly look at.

5    Q.   Can you give me an estimate, based on your experience

6         running the clinic?

7    A.   I can give you a range.

8    Q.   Sure, that'd be fine.

9    A.   Anywhere from 75 to 125.

10   Q.   And that's for each semester?

11   A.   That would be fall and winter.  In the spring/summer,

12        when we only have five or six clinicians, you figure

13        five clients per clinician, and then some rotating in

14        and out, you could have a range of anywhere from 25 to

15        45.

16   Q.   So you limit the number of clients that you see, based

17        on the clinicians that you have available?

18   A.   Correct.

19   Q.   Has there ever been a situation where a client has

20        needed to continue counseling past a given semester?

21   A.   That is correct, yes.

22   Q.   That's occurred?

23   A.   Mm-hmm.

24   Q.   What do you do?  My -- what do you do with a client,

25        in that circumstance?  Do you -- is the -- does this



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

**Pl.'s MSJ Ex. 25 - 242**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 39

1      -- does the student who's been seeing that client

2      continue to see that client, or do you transfer that

3      client to somebody else, to accommodate them in some

4      other way?

5   A.    In a particular case, if counselor A sees a client,

6      let's say, for five sessions, and the semester comes

7      to a close, especially towards the end of a semester,

8      we inform all clients you're coming to the close of a

9      semester, you might just see this clinician five

10     times.  If the client agrees and understands that,

11     then the client moves forward.  They see the counselor

12     five times.  At the end of that, they do a termination

13     session where, in most cases, the

14     counselor-in-training and the client talk about what

15     gains have been made, what other things could they

16     work on, what goals have been met, what goals haven't

17     been met, and then they say, "Would you like to

18     continue on counseling next semester with a new

19     clinician?"

20             The client then has the ability to say yes,

21     no, or maybe.  We have an active, pending, and, you

22     know, closed case.  The client is then put on the list

23     for the next semester.  When the next semester gets

24     started, they are first in the rotation to receive a

25     counselor-in-training, and begin the process over



**Pl.'s MSJ Ex. 25 - 243**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 40

1        again.  We want to ensure that the client is given the

2        opportunity, the autonomy to say yes, no, or maybe --

3        it's their decision -- as well as review with them

4        what progress they've made and what goals they might

5        want to additionally seek in the future.

6  Q.   How often each semester would you say clients are

7        carrying over and switching from one student to a

8        different student in the --

9  A.   I really don't know, I don't keep track of that.

10  Q.   Does -- in your experience, does it happen a lot, a

11        little?

12  A.   I can't give you a number, because I don't know.  I do

13        know that it does happen.

14  Q.   Okay.  Do you have any supervisory responsibilities

15        over the students who are in -- actually engaging in

16        the counseling, or is that supervisory role satisfied

17        solely by whoever the supervising professor is for

18        that particular standpoint?

19  A.   Supervision comes in two forms, administrative

20        supervision and clinical supervision.  Now nothing's

21        ever quite that, you know, clean or dichotomous.  My

22        job, as the administrator of the clinic, is to provide

23        administrative supervision.  So I manage the process

24        of, you know, clients coming in, making sure that the

25        clinic's running smoothly, answering questions to



Pl.'s MSJ Ex. 25 - 244

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 41

1     clients, to counselors-in-training about particular

2     processes, keeping files where the files are kept, and

3     such.

4             When I offer clinical supervision, it's

5     usually because the clinical faculty member, the

6     supervising faculty member is either not available or

7     it's an emergency situation.  So I may get called in

8     in the cases I have in the past, when a client

9     demonstrates, say, suicidal ideation or talks about

10    child abuse.  And it may be during the day before

11    their faculty supervisor has arrived, or isn't in that

12    day.  In that particular case, I would provide

13    clinical supervision, or I would intervene directly,

14    ensuring the safety of the client, because the

15    client's safety and needs are paramount for us.

16 Q.   Is the -- is the primary responsibility for providing

17    supervision for the students enrolled in practicum

18    with the supervising faculty that are overseeing that

19    student's practicum course?

20 A.   Primary clinical supervision is provided by the

21    faculty supervisor, who has the responsibility for

22    that particular pod of students.

23 Q.   When a client comes to the clinic, first visit--

24 A.   Mm-hmm.

25 Q.   -- prior -- yeah, first visit, and says they want to



Pl.'s MSJ Ex. 25 - 245

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 42

1       engage the clinic's counseling services, walk me

2       through the process, what happens with that particular

3       person?

4   A.  Generally someone would call, either because of

5       referral from various sources, or because they have

6       found us through various referral sources, call the

7       clinic, the secretary, my GA, or I would take the call

8       and gather particular information.  Name, address,

9       phone number, e-mail, and generally what's the

10      presenting issue.  I try my best to screen out those

11      clients who are presenting with issues that are beyond

12      the skill level of the clinicians that we have.  In

13      other words, we have beginning level clinicians; so,

14      I'm not going to take someone who's actively suicidal,

15      that would be inappropriate, and then I would make a

16      referral to someone outside, you know, give them three

17      or four names or other resources where they could find

18      services.  The paper, the initial client contact form

19      would be given, then, to my GA, who handles the

20      appointment book.  She would then contact that

21      particular client, and find an appropriate time for

22      them to meet with our clinician, and depending upon

23      the availability of the clinician.

24  Q.  Who is the GA that you -- that oversees the assigning

25      of the clients?



**Pl.'s MSJ Ex. 25 - 246**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 43

1    A.    During Julea Ward's time, it was Shannon Thayer.

2    Q.    Is that a rotating position that students fill from

3          time to time, or is there -- is it a permanent

4          position?

5    A.    Well, "permanent" in any university setting is

6          nebulous, at best, when it comes to students.  It is a

7          GA graduate assistant position.  So, GAs are assigned.

8          My GA, or the GA that works basically for me at the

9          clinic, I generally try and keep for two to two and a

10         half to three years.  So, throughout the duration of

11         their education.

12   Q.    What's your role in the actual assignment of a

13         prospective client to a student counselor?  What do

14         you do in that process?

15   A.    I hand it to my GA, who has made it -- in this

16         particular case, Shannon Thayer.  And, you know, now

17         Shannon's not there, Shannon's graduated, but in

18         Shannon's case, she would often tell me to stay out of

19         the appointment book, because I'd screw things up.

20   Q.    So, did she have autonomy to assign clients to student

21         counselors as she saw fit, as far as the scheduling

22         availability went?

23   A.    She had limited autonomy, in the sense that what I

24         would do is hand her the initial contact form; she

25         would match up times to clients, to counselors and



**Pl.'s MSJ Ex. 25 - 247**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 44

1       then contact the prospective client and offer whatever

2       times that we had.

3  Q.  Would you approve the client assignment, or would that

4       be something that she would just handle on her own?

5  A.  There's no approval or disapproval.  It's, here's the

6       client, here's the time, here's the clinician, do it.

7       There are particular times where, if a particular

8       client, per se, is a child, and we have certain

9       clinicians who want to have experience with children,

10      and if they're available, then we can match.

11  Q.  So let's -- you do, at times, do matching, based on

12      what a client needs and is presenting, and what a

13      counselor's interested in getting experience based on?

14  A.  No.  It mostly has to do with population base, child,

15      adolescent, adult.

16  Q.  So -- but your testimony, I believe, was that if, say,

17      there's a child client and there's a student and

18      counselor who wants some experience counseling a

19      child, that you would attempt to match those, the

20      client with that counselor, so that they could gain

21      that experience?

22  A.  The difference in languaging (sic) is, that's a

23      population issue.  In other words, somebody wants

24      experience with a child, not a particular demographic,

25      in the sense of depression, anxiety, a particular



Pl.'s MSJ Ex. 25 - 248

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 45

1       diagnosis.

2   Q.   So you do population matching, but not diagnosis

3        matching?

4   A.   Yes.

5   Q.   So if a student said, I have struggled and would like

6        to increase my skill set when it comes to people

7        presenting with the issue of depression, you'd make no

8        attempt to get that particular student counselor

9        individuals who are presenting with the issue of

10       depression?

11  A.   Generally, no.

12  Q.   But you potentially would, or you just would not?

13  A.   If the occasion arose and we were able to, but that's,

14       again, happenstance.

15  Q.   Can you think of any circumstances, specific

16       circumstances, where you have matched a client with a

17       counselor for a particular reason?

18  A.   Other than, say, child, adolescent, and adult, I

19       cannot recall an occasion at this time.

20  Q.   Can you think of any situation where you avoided

21       assigning a particular client to a particular

22       counselor, for any particular reason?

23  A.   Yes.

24  Q.   Okay.  Can you tell me about those situations?

25             MR. GREDEN:  And just to clarify, please



Pl.'s MSJ Ex. 25 - 249

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 46

1       don't reveal any student names or client names.

2                   THE WITNESS:  Thank you.

3    A.   A client, or a counselor, who had just suffered the

4         loss of a significant person in their life, and a

5         client who had a -- was coming in to deal with grief

6         issues.  So, in that particular case, we thought it

7         better not to do that.

8    BY MR. TEDESCO:

9    Q.   Okay.  Were there any other -- are there any other

10        situations?

11   A.   I cannot think of any others.  Generally.  In

12        practicum, and this is not an intentional thing, you

13        get the clients you need, not the clients you want.

14   Q.   What do you mean by that?

15   A.   You get the clients who present to you issues that

16        help you stretch and learn and grow, not the clients

17        that you can softball.

18   Q.   So does that -- is there -- is there an intentional --

19        let me restate the question.

20                   In the process of assigning clients to

21        student counselors, do you or your staff actively seek

22        to assign a client to a counselor, because you know

23        that counselor needs to be stretched on a particular

24        issue?

25   A.   No, it all happens by happenstance.



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 47

1   Q.   Okay.  Have you ever done that in your --
2        recollection?  Have you ever had a situation where you
3        thought, this particular counselor could probably
4        benefit from having this client assigned to them,
5        because it will stretch some -- some boundary issues,
6        or something that they're struggling with?
7   A.   No.
8               MR. TADESCO:  At this point, I'm going to
9        pull these exhibits that we're going to classify the
10       deposition into different categories, so...
11                       *       *       *
12  BY MR. TEDESCO:
13  Q.   Back to Exhibit 1, Leigh, if you could hand that over.
14  A.   You know, I want to address something.  It's an
15       interesting question that you ask -- that, at times, a
16       client may not like your style, and it just has to do
17       with style, tone of voice, who you are, that they may
18       want a more directive style, or a less directive
19       style.
20               That has more to do with style, and that's
21       what I mean when I say, you don't get along with all
22       clients, and all clients don't get along with you.  It
23       doesn't go towards direction of a values issue,
24       because that's not an issue that you bring up.  You --
25       you are the blank slate for the client to bounce



Pl.'s MSJ Ex. 25 - 251

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 54

1   counselor who is seeing that person to try and become

2   aware of and deal with those issues in an appropriate

3   and therapeutic way, not just for the client, but for

4   the counselor.

5   Q.   But if the counselor comes to the conclusion that, I

6        think -- not out of animosity towards the client--

7   A.   Mm-hmm.

8   Q.   --but because they want to be as helpful as they can

9        be to the client, that those values situation is not

10       -- is going to potentially negatively impact the

11       session, is it okay for them to refer the client to

12       someone else, at that point, after going through

13       supervision, education, and things like that?

14  A.   I would, then, suggest that they continue to receive

15       additional supervision and, in fact, might consult

16       with or have a colleague monitor their work, to ensure

17       that that doesn't happen.  And, that if that does

18       leak, that they can become aware of it and deal with

19       it.

20  Q.   If the counselor believes that that's just not going

21       to be possible, what's their -- what's their option?

22  A.   I'm not sure there is an option.

23  Q.   You either continue as a professional counselor or you

24       don't?

25  A.   If there are issues that are so paramount to you that



Pl.'s MSJ Ex. 25 - 252

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 55

1     you cannot suspend them, bracket them off so that you

2     can be fully present with someone in their pain, then

3     I would suggest that you may not be appropriate for

4     the profession at this time.

5   Q.   Let's -- let's go to Exhibit 1 now.

6              MR. TEDESCO:  Leigh, are you going to be

7     asking some questions, as well?

8              MR. GREDEN:  I will, but not that many.

9              MR. TEDESCO:  Okay.

10  BY MR. TEDESCO:

11  Q.   If you could turn with me, Dr. Francis, in Exhibit 1,

12    to page 59.  The provision C5, Nondiscrimination, I'm

13    just going to read that into the record.  It says,

14    "Counselors do not condone or engage in discrimination

15    based on age, culture, disability, ethnicity, race,

16    religion/spirituality, gender, gender identity, sexual

17    orientation, marital status/partnership, language

18    preference, socioeconomic status, or any basis

19    prescribed by law.  Counselors do not discriminate

20    against clients, students, employees, supervisees, or

21    research participants in a manner that has a negative

22    impact on those persons."

23              I just want to ask you a series of

24    questions, a series of questions about this provision.

25    First of all, the provision states that counselors



**Pl.'s MSJ Ex. 25 - 253**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 56

1    cannot condone any of these forms of discrimination.
2    What does condone mean, within the context of this
3    provision?
4    A.   To agree and/or promote.
5    Q.   Can you give me an example of improper condoning of
6    discrimination?
7    A.   That I would believe that persons involved in an
8    interracial marriage to be improper, immoral, and
9    contrary to the human condition.
10   Q.   So if you believe that, that's an improper condoning
11   of discrimination under this policy?
12   A.   Yes.
13   Q.   Is there anywhere within Eastern Michigan-- I'm sorry,
14   restate the question.
15              Is there anywhere within the Counseling
16   Student Handbook that the term, condone, is defined
17   within the context of this policy?
18   A.   Not that I'm aware of.
19   Q.   Are there any other EMU documents or policies that
20   define what condone means?
21   A.   Not that I'm aware of.
22   Q.   How about the term, culture?  What does culture mean
23   within the context of this policy?
24   A.   Culture are those values, practices, opinions of a
25   group of people that help define them and their



**Pl.'s MSJ Ex. 25 - 254**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 57

1       actions and behaviors.

2    Q.   Is there anywhere in the Eastern Michigan University

3         Counseling Student Handbook where culture is defined?

4    A.   Not that I'm aware of.

5    Q.   Is it defined in any other EMU documents or policies?

6    A.   It is discussed at length in Counseling 571, Cross-

7         Cultural Counseling.

8    Q.   Anywhere else you can think of?

9    A.   It may be mentioned in other classes, as it arises.

10   Q.   How about religion, what does religion mean within the

11        context of this policy?

12   A.   Religion is a set of beliefs, in most cases, an

13        organized set of beliefs, adhered to and practiced by

14        a group or groups of people.

15   Q.   What's the difference between religion and

16        spirituality?

17   A.   Religion is a set of beliefs, practices, that are

18        organized and adhered to by a particular group of

19        people, whereas spirituality, in many cases, has to do

20        with how one practices their belief system in a

21        personal way, that may not have to do with any

22        particular organized religion, and deals with their

23        actions in how it is reflected with either their

24        relationship with a higher power or some identified

25        system of behaving.



**Pl.'s MSJ Ex. 25 - 255**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 58

1  Q.  Is there anywhere within the counseling student

2      handbook where those definitions you gave of religion

3      and spirituality are specified?

4  A.  Not that I'm aware of.

5  Q.  Is there anywhere else, within EMU documents or

6      policies, where these terms are defined?

7  A.  This would have been covered, in one way or another,

8      in Counseling 571, the cultural counseling,

9      inter-cultural counseling course.  There are no other

10     places that I'm aware of, within the documents and

11     policies.

12 Q.  How about gender identity?  What does it mean, within

13     the context of this policy?

14 A.  Gender identity is how a person perceives and

15     expresses their gender.

16 Q.  What falls under -- what genders are protected by

17     this -- by this provision, and by this term, gender

18     identity?

19 A.  Would be people who express themselves, male, female,

20     androgenous, nongender, transgendered.

21 Q.  Does the counseling student handbook define gender

22     identity anywhere?

23 A.  Not that I'm aware of.

24 Q.  How about any other EMU documents or policies?  Do

25     they define gender identity anywhere?



Pl.'s MSJ Ex. 25 - 256

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 59

1    A.   Not that I'm aware of.

2    Q.   Sexual orientation is also included in the policy.

3         Can you define what sexual orientation means for me?

4    A.   Sexual orientation is an expression of one's gender,

5         in the sense of how I practice or perceive my

6         sexuality -- either as heterosexual, homosexual, or

7         neither.

8    Q.   What is neither?

9    A.   Someone who is -- does not view themselves as

10        attracted to either gender, even have, you know,

11        bisexual, heterosexual, homosexual, and "I'm not

12        attracted to anybody."

13   Q.   Okay.  I had not heard of that.

14   A.   I actually had a client like that.

15   Q.   Okay.  Does the counseling student handbook provide a

16        definition anywhere of sexual orientation?

17   A.   Not that I'm aware of.

18   Q.   Do any other EMU documents or policies define what

19        sexual orientation means?

20   A.   These are all issues that are brought up and covered

21        in various classes, more specifically in the Cross

22        Cultural Counseling Course, Counseling 571.  I do not

23        know of it in any other policy or procedure.

24   Q.   Can you tell me what marital status means, within the

25        context of this policy?



**Pl.'s MSJ Ex. 25 - 257**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 60

1    A.    Marital status, married, unmarried, divorced, single,
2          separated.
3    Q.    Anything else?
4    A.    I'm sure there are, but I couldn't name every one of
5          them.  I'm sure that might deal with cultural issues.
6    Q.    Okay.  In what way would that deal with cultural
7          issues?
8    A.    How a particular culture views marital status.
9    Q.    Is polygamy a marital status?
10   A.    In Arizona City.
11   Q.    Is it one -- polygamy protected by this prohibition on
12         marital status discrimination?
13   A.    Yes.
14   Q.    How about -- well, can you define for me what a
15         polyamorous relationship is?
16   A.    Polyamorous would then be, as the word states, many
17         loves, having or seeking the love from several people.
18   Q.    Would it be protected by this provision?
19   A.    Yes.
20   Q.    What's the difference between marital status and
21         marital partnership?
22   A.    Whereas a marital partnership, it may be a
23         relationship that, say, mimics marriage in the sense
24         that you have two people who've agreed to come
25         together and operate as a couple; or, to take it to



PERRY CLARK FRANCIS
December 17, 2009

Page 61

1        the extreme that you were taking it, as a team, and

2        may not have the legal aspects of marriage, as defined

3        by the State.

4    Q.  Are the terms marital status and marital partnership

5        defined anywhere in the counseling student handbook?

6    A.  Not that I'm aware of.

7    Q.  Are they defined anywhere else in Eastern Michigan

8        University documents or policies?

9    A.  Not that I'm aware of.

10   Q.  How about language preference, what does that mean

11       within the context of the policy?

12   A.  We are becoming a much more diverse culture.  And as

13       our culture becomes more diverse, there are more and

14       more people whose primary language is something other

15       than English, or American, depending on which side of

16       the pond you're on.  And so, a client may come in with

17       a language preference for something other than

18       English.  We do not discriminate and force somebody to

19       talk in a language that they are uncomfortable with,

20       with us, and would interfere with our ability to

21       provide services.

22   Q.  Can you give me an example of a language preference

23       discrimination?

24   A.  In a school counseling situation, where a student who

25       would come in who may be new to the United States and



**Pl.'s MSJ Ex. 25 - 259**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 62

1        speaks only, say, a language other than English --
2        let's pick one that's easy, Spanish.  And I, as the
3        counselor, do not speak Spanish.  If I were to try and
4        force the client only to speak English to me, that
5        would be discriminatory.  I'm under obligation to see
6        if I can either find a person to translate for me, in
7        making sure that that person understands the bounds of
8        the counseling relationship, so that they -- I can
9        communicate with that person, that's my
10       responsibility.  It would be discriminatory to force
11       them to speak in a language that they may not
12       understand.
13   Q.  What if an interpreter was unavailable, you couldn't
14       find somebody to do it, could you reassign that
15       client, refer that client to someone who can speak
16       Spanish and provide the service that the client needs?
17   A.  If I'm unable to communicate with the client at all,
18       and there's nobody available except another counselor,
19       that would be a case where I might refer them.  It
20       would be discriminatory to only provide them English
21       if another counselor is available, in this narrow
22       circumstance, that nobody else is available to provide
23       translation services.
24   Q.  Is there anywhere within the Counseling Student
25       Handbook where a definition of Language Preference



7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 65

1        But not to abandon the client.

2                If you-- for example, I'll give you a very

3        good example, it's called the "small town problem."

4        You're the only counselor available within a hundred-

5        mile radius, the client has no car, there's nobody

6        else to provide service, then you need to do the best

7        you can to provide the appropriate services to help

8        them.  It may be to wait-list them, if their issues

9        are not life-threatening, that they cannot be delayed

10       until you have an opening where you can provide

11       services, then you wait-list them, and then provide

12       the service.

13   Q.  Just so I can understand your answer, would it be okay

14       -- if alternative sources were available, alternative

15       counselors were available -- for the counselor who

16       couldn't accommodate that client who was unable to pay

17       for the services, to that other counselor who was able

18       to accommodate that client?

19   A.  That is a practice that happens; and, in fact, it's

20       how oftentimes we get clients at our clinic.

21   Q.  If you could turn to pain 47 of Exhibit 1, Provision

22       A4B, titled "Personal Values"?

23   A.  Mm-hmm.

24   Q.  And I'll just read that into the record.  It says:

25       "Counselors are aware of their own values, attitudes,



**Pl.'s MSJ Ex. 25 - 261**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 66

1      beliefs, and behaviors, and avoid imposing values that

2      are inconsistent with counseling goals.  Counselors

3      respect the diversity of clients, trainees, and

4      research participants."

5              Can you tell me what "imposing" means,

6      within the context of this policy?

7   A. It would be -- it could be seen in different ways, by

8      imposing what you believe to be the appropriate goals

9      for the client; based on your value system of what you

10     think the client should do.  It could be based on

11     imposing your particular views about how a client

12     should behave, act, be perceived, within your value

13     system.

14  Q. Is imposing values something that occurs within the

15     context of the counseling session?

16  A. I'm not following your question -- at the --

17  Q. Can you run afoul of this provision, only when you're

18     in the counseling session with the client, one-on-one?

19     Is that when the imposing values can occur and be

20     improper?

21  A. The counseling relationship begins from the moment the

22     client makes a phone call to you, so imposing values

23     or not imposing values begins from the moment the

24     client calls.  It begins, if you are assigned a client

25     and you're reading their case notes, or reading their



PERRY CLARK FRANCIS
December 17, 2009

Page 67

1    referral photos.  We read those, not based on our

2    values, but based on what is in the best interests of

3    the client.  So, does it take place only in the

4    context of when the person's in front of me?  No, it

5    can take place before I even see the client, by making

6    judgments about them based upon what I might hear --

7    if a client calls and has a thick accent, and my

8    values are, "all immigrants should be sent back to

9    where they came from."

10   Q.   Okay.  How about -- I'm sorry, let me restate the

11        question.

12             Okay, the policy says that you are not to

13        impose your values when they are inconsistent with

14        counseling goals.

15   A.   The ethics say that.

16   Q.   The ethics code says that.

17   A.   Mm-hmm.

18   Q.   Is it permissible then, under this policy, to impose

19        your values when they are consistent with counseling

20        goals that the client sets?

21   A.   That would also be imposing values.  Whether they

22        agree with the client or not, my values are not -- are

23        not what the session is about.  It's working within

24        the values of my client.  So, I try and suspend or

25        bracket off what I have, to be fully aware and present



**Pl.'s MSJ Ex. 25 - 263**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 68

1        with what the client brings in.
2   Q.   The ethics code states, that you can't impose the
3        values when they're inconsistent with counseling
4        goals.  Why doesn't it just say you can't impose
5        values, if it's true that you can never impose values?
6   A.   You'd have to ask the people who wrote this.
7   Q.   Your understanding of this policy is that there's no
8        time when you could impose your values, even if
9        they're consistent with counseling goals set by the
10       client?
11  A.   There are the normal exceptions of saving a client's
12       life; saving someone else's life who the client may
13       seek to harm; but, beyond that, whether I agree with,
14       or don't agree with the client, becomes secondary to
15       what the client is bringing in to me, and what they're
16       struggling with.  I may agree with a client, and if I
17       -- for some reason -- reveal my values, that may then
18       imply to the client that other things that they're
19       doing, I'm in agreement with, when I might not.  And
20       that would then interfere with the counseling
21       relationship and cause the client to make assumptions
22       that were incorrect.
23  Q.   Is there ever a situation where, rather than imposing
24       your values, you share your values with the client,
25       where you think that it may be helpful to them,



Pl.'s MSJ Ex. 25 - 264

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 71

1      beliefs or practices that would not -- that cause harm

2      to people, that shouldn't be accorded the respect

3      under this policy?

4   A.   Not that I can think of, off the top of my head.

5   Q.   Other than the couple that you've just referenced?

6              We're going to turn to Exhibit 2 now.  And

7      Dr. Francis, this is the ACA ethics opinion regarding

8      conversion or reparative therapy?  Are you familiar

9      with this opinion?

10  A.   Yes.

11  Q.   And how did you become familiar with it?

12  A.   It is one that I read about, and in fact, read this

13      morning, again.

14  Q.   Okay.  And have you ever provided this ethics opinion

15      to students in your classes?

16  A.   No.

17  Q.   Have you ever discussed it with students?

18  A.   Yes.

19  Q.   And what was the -- what class do you do that in?

20  A.   It would have been discussed in any number of classes,

21      specifically, ethical and legal issues and

22      professional issues and counseling -- college

23      counseling as well as discussing -- discussing

24      nondiscriminatory practices within the counseling

25      profession, in a course that we no longer teach that



Pl.'s MSJ Ex. 25 - 265

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 72

1       has been subsumed into-- it's a professional

2       orientation course.  It has been subsumed into

3       Counseling 505.

4   Q.  And why did you -- why did you determine that you

5       should hand this out to students and discuss it in

6       class?

7   A.  I didn't say I handed this out.

8   Q.  Oh, that was my question, did you provide to

9       students-- oh, I'm sorry, you said you discussed it.

10  A.  Mm-hmm.

11  Q.  Why did you determine that you should discuss it with

12      students?

13  A.  In the broader sense, it begins to deal with how we,

14      as counselors, our professional orientation is to

15      provide a nonjudgmental stance, and also to talk about

16      that reparative and conversion therapy has no basis,

17      currently, in science, and that the ACA, APA, and any

18      other number of professional mental health

19      associations have stated that reparative or conversion

20      therapy is inappropriate for a science -- let me put

21      it in a different way.  It has not been proven to be

22      effective through scientific, rigorous scientific

23      study.

24  Q.  Can you define for me what reparative therapy is?

25  A.  Reparative and/or conversion therapy is therapy that



PERRY CLARK FRANCIS
December 17, 2009

Page 73

1      would move a client from the current sexuality that

2      they believe that they have, to one that they may

3      perceive that they need to have, according to society

4      or a particular religious belief.

5  Q.  On page 4 of this exhibit, point No. 5, it states that

6      there are -- and I'm quoting the opinion now.  It

7      says, "There are treatments endorsed by the

8      Association for Gay, Lesbian and Bisexual Issues in

9      Counseling, a division of the American Counseling

10     Association, and the American Psychological

11     Association, that have been successful in helping

12     clients with their sexual orientation.  These

13     treatments are gay-affirmative, and help a client

14     reconcile his/her same sex attractions with religious

15     beliefs."

16            Can you tell me what "gay-affirmative

17     treatments" are?

18  A.  These would be treatments that do not provide

19     judgment, that if someone is homosexual, that they're

20     bad or deviant, mentally ill, or have a pathology.

21  Q.  And where it states that, "These gay-affirmative

22     treatments help a client reconcile his/her same-sex

23     attractions with religious beliefs," how do these gay

24     affirmative treatment protocols assist clients in

25     doing that?



Pl.'s MSJ Ex. 25 - 267

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 74

1    A.    It would be to help the client come to terms with what

2          their particular religious belief might be, and what

3          their particular sexual orientation might be, and help

4          them struggle, wrestle, come to terms with how to

5          bring those two together, or if they cannot bring

6          those two together, how to live without that -- that

7          bringing those two together, in a way that may be more

8          helpful or healthful for them.

9    Q.    Under gay-affirmative approach to therapy, if you had

10         a client who stated that they were homosexual, but

11         also stated to you that they came from a religious

12         background in training, that taught that it was

13         immoral to be homosexual or engage in homosexual

14         relationships or behavior, would it be consistent with

15         gay affirmative therapy to help that client embrace

16         their religious beliefs and reject change their

17         homosexual orientation?

18   A.    I believe it would be appropriate to help the client

19         deal with those goals that they bring forth into

20         counseling.  What you're stating is the counselor's

21         agenda.  I'm asking, is it the client's agenda?

22   Q.    My question then, to clarify, is what if the client's

23         goal, ultimately, is to embrace their religious values

24         that teach that homosexual orientations, behaviors are

25         immoral, and to ultimately change their -- their



**Pl.'s MSJ Ex. 25 - 268**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 84

1        referrals to gay-affirmative counselors, should they

2        need to make a referral beyond that.

3    Q.  I'm -- the counselor would have to provide the parents

4        with the names of gay-affirmative counselors, as well?

5    A.  Well, let's see what it says in here.

6    Q.  Please.

7    A.  Page 5, second paragraph:  "There's also agreement

8        among the committee members that any counselor stating

9        that they can offer conversion therapy must also offer

10       referrals to gay, lesbian, and bisexual affirmative

11       counselors, and should discuss thoroughly the rights

12       of the clients to seek professional

13       counsel -- the professional's counsel."

14   Q.  Well, that sentence seems to assume that there are

15       some professional counselors that provide conversion

16       therapy, correct?

17   A.  Yes.

18   Q.  And so, if you were the counselor that we just

19       discussed, in that situation that I presented to you,

20       and the counselor -- well, you said the counselor

21       would have to discuss the scientific evidence

22       regarding reparative therapy, and then provide an

23       appropriate resource for those people to maybe go and

24       get the help they want --

25   A.  Well --



PERRY CLARK FRANCIS
December 17, 2009

Page 85

1    Q.    And also to provide them with gay-affirmative

2          counselors' names?

3    A.    The person that is providing the conversion therapy

4          needs to be able to also provide referrals, as it

5          states here, to people who are gay, lesbian,

6          bisexually-affirmative counselors.  In other words,

7          part of the things that I would then educate the

8          parents on is, one, I can't provide the service; two,

9          these are the things that you need to be aware of when

10         working with someone who does provide these services,

11         you know, they must be able to state to you that this

12         is unproven, that, you know, what are the limitations,

13         what are the benefits, what are the -- what has

14         research shown this to do and not do?  That, should

15         this not be the way you want to go, here are the names

16         of people who can provide affirmative counseling for

17         your son or daughter.

18   Q.    Okay.

19   A.    So that I'm giving them the education that they need,

20         and in a sense, a consumer protection advocate, saying

21         to them, "here are the things that you need to be

22         looking for in this particular case."  Let's say you

23         want to go get LASIKs (sic).

24   Q.    Get what?

25   A.    LASIKs.



Pl.'s MSJ Ex. 25 - 270

PERRY CLARK FRANCIS
December 17, 2009

Page 86

1    Q.   Eye surgery?

2    A.   Eye surgery.  Wouldn't you want the person who

3         provides that for you, or recommends that to you, that

4         these are the things you need to be looking for in a

5         good LASIK surgeon.

6    Q.   Are you asking me questions in my deposition?

7    A.   Yes, I'm asking you questions in your deposition.

8    Q.   I refuse to answer.  I advise myself not to answer.

9              MR. GREDEN:  Very good.

10             THE WITNESS:  Isn't it true that the

11        attorney who takes himself as a client has a fool

12        for -- never mind.

13             MR. TEDESCO:  Attorney jokes?  Your

14        attorney's sitting right next to you.

15   BY MR. TEDESCO:

16   Q.   Just a couple more questions I want to ask you about.

17        And this is in relation to the formal -- your

18        participation in the formal review committee hearing,

19        regarding Julea Ward's case.

20   A.   Thank you.

21   Q.   Prior to that hearing, other than your involvement

22        with what happened in the counseling clinic --

23   A.   Mm-hmm.

24   Q.   -- with Julea, and Dr. Callaway --

25   A.   Mm-hmm.



Pl.'s MSJ Ex. 25 - 271

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 90

1    you know, and I'd say, "I really can't talk about it,"

2    I don't -- I do not recall.  If you have something to

3    show me, please.

4  Q.  I don't.  Just asking.

5  A.  Yeah.

6  Q.  Do you -- are you aware that Julea appealed the

7    decision to Dean Polite?

8  A.  Yes, we got a copy of his letter.

9  Q.  Okay, in between the time that Dr. Ametrano sent the

10    letter, informing Julea of her dismissal, and the

11    ultimate resolution of the appeal by Dean Polite, did

12    you have communications with anybody about the

13    situation, e-mail, telephone, direct conversations?

14  A.  Other than appropriate staff, Shannon, you know, who

15    may be, you know, what's happening, oh, you know, not

16    really able to discuss it, not that I recall.

17  Q.  Would you tell them any details about the situation?

18  A.  No.  Not allowed to.

19  Q.  Okay.  Give me a minute just to make sure I've covered

20    everything I want to cover.

21         MR. GREDEN:  Let's go off the record for a

22    minute.

23         (Off the record at 5:08 p.m.)

24         (Recess taken at 5:09 p.m.)

25         (On the record at 5:31 p.m.)



**Pl.'s MSJ Ex. 25 - 272**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 91

1    BY MR. TEDESCO:

2    Q.    The final questions that we were talking about, right

3          before we took a break, I want to -- I'm -- I want to

4          make sure I understand your answer.  If a counselor is

5          in a situation where their clients are -- the clients

6          are parents of a minor child, who recently told them

7          that she's a lesbian and has come out to them, and the

8          clients say, "We're here because we're deeply

9          religious people, we think that this is immoral, that

10         the behavior's immoral, that the -- thinking that

11         you're a lesbian is immoral and wrong, we want you to

12         help us help our daughter not be a lesbian, and not

13         engage in --

14   A.    Mm-hmm.

15   Q.    -- homosexual behaviors and relationships, the

16         counselor, in that setting, does what?  Do they

17         provide an appropriate referral to a counselor who

18         does reparative therapy, or do they not provide a

19         referral at all?

20   A.    The counselor sits down.  First, you want to, at the

21         very least, empathize with their position, where

22         they're at -- that this is a shocking situation,

23         possibly, for them, or whatever they're feeling at

24         that time.  And then, to discuss with them, you know,

25         again, you know -- not reaffirm, is not the word I'm



Pl.'s MSJ Ex. 25 - 273

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 92

1    looking for, but to reconfirm what their goal is, to

2    educate them concerning, you know, what is sexual

3    development, how does it occur, and to talk about what

4    we know from a science point of view, you know, what's

5    going on here, and then to go on to talk about, you

6    know, reparative therapy -- that it is not considered

7    a standard of care that is supported by the mental

8    health profession.  And that, one, I do not provide

9    that kind of care, it's just not within my skill set,

10   nor is it something I've learned.  Secondly, that I

11   would then talk to them about, if you -- you know, if

12   you choose to continue-- you know, I can't see you,

13   because I don't provide that kind of care, that's not

14   the standard of care within the profession.

15   Q.   Okay.

16   A.   Secondly, to talk about, these are the things that you

17        should expect from somebody who does provide that

18        therapy, and talk about what they should be looking

19        for.

20             And then, to point them in the appropriate

21        direction to find a referral.  I don't have a

22        referral.  I don't know of anyone who provides that

23        service, and I don't know of any counselors right now,

24        in my professional contacts, that know of anybody that

25        provides that service.  But I would point them in the



**Pl.'s MSJ Ex. 25 - 274**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 93

1           direction of where they might find that, which could

2           be through an American Association of Christian

3           Counselors, AACC.  I don't know if the Counseling and

4           Psycholog -- or, Christian Association of

5           Psychological Studies provides that type of referral

6           service.  I don't think so -- they've always struck me

7           as not supporting reparative therapy.  So, you know,

8           point them in the direction of where they can find

9           resources.

10    Q.    Okay.  Just a couple more questions.  You mentioned

11          two professors that you had talked to, in between the

12          informal review conference and the formal review

13          hearing, regarding Julea Ward's case.

14    A.    I talked to two professors between when I was notified

15          there would be a formal review, and before the formal

16          review concert.

17    Q.    Okay, and that notification occurred after the

18          informal review conference occurred?

19    A.    Correct.

20    Q.    Okay.  Did you -- what did you speak to them about,

21          specifically?

22    A.    The issue, as presented to me.  Here -- here are the

23          facts as I know them.  What are your thoughts about

24          this?

25    Q.    Okay.  And where did you get the facts from, that you



Pl.'s MSJ Ex. 25 - 275

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 94

1      were explaining to them?

2  A.  The facts, as I knew them, in the sense that, here we

3      have a student who said, you know, from what I was

4      exposed to down at the clinic, you know, here I have a

5      student who was-- refused to see this particular

6      client.  The fact that, right after the informal

7      review, I happened to be upstairs.  My office is on

8      the first floor, the department office and where my

9      other office is is on the third floor, and I was

10     upstairs when Dr. Callaway came out of the clinic, or

11     came out of the conference room and said that Julea

12     Ward's being suspended from practicum, and at that

13     point, I had a good idea of what was going on, based

14     on what had happened previously.

15 Q.  Okay.  Sorry?

16 A.  Getting your addiction.

17 Q.  Yeah, tell me about it.

18          When you spoke to Dr. Callaway, as you

19     said, upstairs, what -- what was -- what else was

20     discussed, if anything?

21 A.  That was it.  Because she was going to come downstairs

22     and get Julea's tapes and any files that she might

23     have, and anything she might have down in the clinic.

24     And I said, don't worry about that, I'll take her

25     downstairs, and I'll do that.



Pl.'s MSJ Ex. 25 - 276

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 102

1   A.   No.  God no, that would be -- that would be thought

2        control.

3   Q.   You testified earlier today, under examination by Mr.

4        Tedesco, that a single incident of bad rapport with a

5        client does not necessarily -- demonstrate that a

6        counselor has a skill deficiency; is that a fair

7        representation of your testimony?

8   A.   Yes.

9   Q.   How do you distinguish between that situation, where a

10       counselor-in-training may have a single incident of

11       bad rapport, versus what you saw regarding Mrs. Ward's

12       behavior?

13  A.   A single incident of bad rapport can be remediated

14       with simple supervision, dealing with skills, or

15       administratively a simple, you know, you need to call

16       the client and make sure you have everything ready

17       when the client comes in.  That's easily remedied by

18       modifying behaviors.  Julea Ward was not willing to

19       modify her behavior, and her behavior was one that was

20       pervasive over an entire class of people or people's,

21       dealing with particular issues that could be

22       considered -- that particular classes of people, whom

23       she was discriminating against.

24  Q.   You testified earlier today about Exhibit 1, page 59,

25       section C5.



Pl.'s MSJ Ex. 25 - 277

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 103

1    A.    Mm-hmm.

2    Q.    Do you recall that testimony?

3    A.    Yes.

4    Q.    I believe you were asked by Mr. Tedesco, how do you

5          define the word "condone."  And I believe you

6          testified, agreed or promote; is that an accurate

7          representation of your testimony?

8    A.    Yes.

9    Q.    You had started to provide an example of how you

10         thought someone could condone discrimination, and I

11         don't know if you were able to answer your question,

12         so I wanted to give you that opportunity.  The example

13         you used was interracial marriage, and I just want you

14         to try and finish your -- your answer.  Do you recall

15         that testimony, or do you --

16   A.    Yes.

17   Q.    Okay, how -- could you provide us the example you were

18         thinking of, about how someone could condone

19         discrimination, based on interracial marriage, in a

20         way that would violate section C5 of the Code of

21         Ethics?

22   A.    Condone is to -- as I believe I've said, was to

23         promote and/or support behaviors or ways of providing

24         counseling that are discriminatory against a class of

25         people, or a different type of people.  That does not



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

Pl.'s MSJ Ex. 25 - 278

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 104

1       mean that a counselor cannot believe what they want to

2       believe.  Counselors believe all sorts of things.

3       We're a very varied profession within all the mental

4       health professions.  But to promote and/or actively

5       practice behaviors that discriminate against a class

6       of people is inappropriate, and violates these

7       particular ethics codes.  You're not providing

8       appropriate clinical care to that class of people.

9   Q.  You also testified earlier, under examination by Mr.

10      Tedesco, that self-disclosure by a counselor,

11      regarding the counselor's views or experiences, should

12      be limited.  And an example you provided was when a

13      counselor has faced a similar situation.  Is that an

14      accurate summary of your testimony?

15  A.  Yes.

16  Q.  Are there times when such self-disclosure by a

17      counselor could be harmful to a client?

18  A.  Very much so.

19  Q.  Could you give an example?

20  A.  Let's use that same example and say, for example, a

21      client was coming in to deal with their -- the

22      ramifications of a divorce in their life.  And let's

23      say the counselor, for whatever reason, had also gone

24      through a similar experience.  The counselor, using

25      self-disclosure, might then begin to talk about their



**Pl.'s MSJ Ex. 25 - 279**

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24

PERRY CLARK FRANCIS
December 17, 2009

Page 108

1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN )

3                     ) SS

4    COUNTY OF MONROE  )

5

6             I, LEISA PASTOR, certify that this

7    deposition was taken before me on the date

8    hereinbefore set forth; that the foregoing questions

9    and answers were recorded by me, stenographically, and

10   reduced to computer transcription; that this is a

11   true, full and correct transcript of my stenographic

12   notes so taken; and that I am not related to, nor of

13   counsel to either party, nor interested in the event

14   of this cause.

15

16

17

18

19

20

21

22             LEISA PASTOR, CSR-3500, CRR,

23             Notary Public,

24             Monroe County, Michigan

25   My Commission expires:  9/7/13



248-644-8888

7a7bcc24-3d62-4d3d-94a1-c48c6bd18a24