UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JULEA WARD,

        Plaintiff,

                                        Case No. 09-CV-11237
vs.                                      HON. GEORGE CARAM STEEH


THE MEMBERS OF THE BOARD OF
CONTROL OF EASTERN MICHIGAN UNIVERSITY,

        Defendant.

_____/

ORDER DENYING DEFENDANTS' MOTION TO DISMISS OR
FOR SUMMARY JUDGMENT ON ALL CLAIMS FOR DAMAGES
DUE TO QUALIFIED IMMUNITY AND THE ELEVENTH AMENDMENT (# 28)
AND DENYING AS MOOT PLAINTIFF'S RULE 56(f) MOTION (# 52)

      The several Eastern Michigan University ("EMU") defendants, which include eight

members of the EMU Board of Regents, EMU's President, EMU's Dean of the College of

Education, five EMU Professors, and an EMU Student Representative, move for dismissal

or summary judgment of former EMU Counseling Graduate Student Julea Wards' claims

for damages arising from Ward's allegations that she was dismissed from EMU's

Counseling Graduate Program due to her religious beliefs on the subject of homosexuality,

in violation of the First  and Fourteenth Amendments.  Defendants argue they are entitled

to Eleventh Amendment and qualified immunity against any award of damages.  Plaintiff

Ward moves for relief from the defendants' motion for summary judgment pursuant to Rule

56(f), arguing the motion is premature due to the need for further factual development in

discovery.  A hearing on the motions was held on January 28, 2010.  For the reasons set

forth below, defendants' motion for dismissal or summary judgment will be denied. Plaintiff's Rule 56(f) motion will be denied as moot.

## I. Background

EMU Counseling Graduate Student Julea Ward filed her Complaint on April 2, 2009, alleging defendants EMU Board of Regents members Wilbanks, Clack, Hawks, Incarnati, Okdie, Parker, Sidlik, and Stapelton, defendant EMU President Dr. Martin, defendant EMU Dean of the College of Education Dr. Polite, defendants Professors of Counseling and Education Dr. Ametrano, Dr. Francis, Dr. Marx, Dr. Callaway, and Dr. Dugger, and Formal Review Committee student member defendant Paula Stanifer, each violated Ward's First Amendment free speech and religious rights, and Fourteenth Amendment due process and equal protection rights, by dismissing her from EMU's Counseling Program for her Christian beliefs and expressions opposing homosexual conduct. EMU's Counseling Department allegedly prohibits graduate students from advising clients during a Counseling Practicum course that they should refrain from homosexual conduct. Ward alleges EMU required her to affirm or validate homosexual behavior.

Graduate students such as Ward counsel between five and eight clients during the Practicum course, which requires completion of 100 hours, usually over one semester. Clients come from the general public and pay EMU a small fee for counseling services. The controversy arose when Ward's third client sought counseling regarding a homosexual relationship. After Ward read the file, and about one hour before meeting the client, she asked her supervisor, Professor Callaway, whether she should refer the client to another counselor because she could not affirm the client's homosexual behavior. Professor Callaway directed that the client be referred to another counselor before Ward met him,

then met with Ward to discuss the situation. After the discussion, Professor Callaway informed Ward that she would not be assigned any more clients, and that she, Callaway, would be requesting an informal disciplinary review before herself and Ward's Advisor, Professor Dugger, as to whether Ward had violated EMU policies set forth in "The Counseling Student Handbook" ("Counseling Handbook"), prohibiting "unethical, threatening, or unprofessional conduct," an "inability to tolerate different points of view," "imposing values that are inconsistent with counseling goals," and "discrimination based on . . . sexual orientation." See Complaint, Ex.1. At an February 3, 2009 informal review, Ward was given the choices of: (1) completing a "remediation program"; (2) voluntarily leaving the Counseling Program; or (3) requesting a formal hearing. Ward chose the latter.

Ward was notified in a February 19, 2009 letter that the formal review was prompted by Dr. Callaway's concerns regarding Ward's performance in the Practicum, and that the formal review was considered "disciplinary in nature" pursuant to page 14 of the Counseling Handbook. The letter informed Ward that she may be disciplined for "a violation of . . . the [American Counseling Association ("ACA")] Code of Ethics and or when a student exhibits a pattern of recurring behavior which may include . . . [u]nethical, threatening or unprofessional conduct" and "[f]ailure to tolerate different points of view[.]" Complaint, Ex. 2. A formal hearing was held on March 10, 2009, which was attended by Professors Callaway and Dugger. Those serving on the hearing panel were Professors Ametrano, Francis, and Marx, and student Stanifer. A transcript of the March 10, 2009 hearing attached to the Complaint as Exhibit 3 evidences: (1) Dr. Callaway disciplined Ward after Ward asked advice whether to refer the homosexual client to another student-in-training, telling Ward "this is not going to work" (Tr. at 13); (2) Ward expressed that she was willing

to counsel homosexuals on any issue "unrelated to that behavior" (Id. at 10); (3) the client "was seeking counseling regarding homosexual behavior" (Id. at 12); (4) Ward asked for a "reasonable accommodation" that "the small percentage of persons seeking counseling regarding homosexual behavior could easily be assigned to another practicum student" (Id. at 14); (5) Ward stated "I will not and cannot affirm any behavior that goes against what the Bible says" (Id. at 27); (6) Ward believed she did not violate the ACA Code of Ethics because she did not "do any harm" to a client (Id. at 30); (6) Ward was asked by Dr. Marx "how someone with such strong religious beliefs would enter a profession that would cause you to go against those beliefs . . . by its stated code of ethics" (Id. at 31); (7) Ward believed referring to another counselor was consistent with the ACA Code of Ethics (Id. 33) and; (8) Drs. Ametrano and Francis opined that, under the ACA Code of Ethics, it is inappropriate  to counsel a client, or offer services, attempting to "change their perceived sexual orientation – from homosexual to heterosexual," and that the ACA "put out a position paper saying [it is] unethical to refer clients to have their sexual orientation changed" or referred to "reparative therapy." (Id. at 37-38).

During the March 10, 2009 hearing, the following exchange took place:

WARD: . . . .  I cannot affirm somebody's behavior if it is, uh, going against my religious beliefs.

FRANCIS: OK, good, I . . . I wanted to make sure I understood that and that was clear for me.

*       *       *

FRANCIS: Let me take it another direction here because I . . . I'm going to get some other things and I'm gonna take it on a little bit of a theological bout.

WARD: OK.

FRANCIS: OK.  Um, is anyone more righteous than another before God?

WARD: Is anyone more righteous than another before God?

FRANCIS: Yeah.

WARD:  God says that we're all the same.

FRANCIS: Yeah.

WARD: That's what God says.

FRANCIS: OK, so if that's your direction . . .

WARD: Ahum.

FRANCIS: . . . how does that fit with your belief that . . . and I understand that you're not, because the word you keep using is affirming, you're not, which comes across as I'm not going to condone that [homosexual] behavior, I'm not going to affirm it, so I'm not going to go that way.

WARD:  OK.

FRANCIS: If that's true, then aren't you on equal footing with these people? With, with everyone?

WARD: Absolutely Dr. Francis.

FRANCIS: OK.

Then doesn't that mean that you're all on the same boat and shouldn't they be accorded the same respect and honor that God would give them?

WARD: Well, what I want to say is, again, I'm not making a distinguishable difference with the person.

FRANCIS: OK.

WARD: I'm addressing the behavior.

FRANCIS: OK, so it's love the saint condemn the sinner, or condemn the sin - I'm sorry.

WARD: If that's the wording you want to use.

FRANCIS: What wording would you use?

WARD: What I've just said.  I'm not opposed to any person.

FRANCIS: Uh huh.

WARD: OK?  I believe that we all are, um, God loves us all, is what I believe.

FRANCIS: OK.  Good.  I . . . I just want to make sure I understand where you're coming from.

Id. at 28-30.

Ward was informed in a March 12, 2009 letter that the panel unanimously concluded

that she should be dismissed from the EMU Counseling Program.

It was the unanimous opinion of the committee that clear and convincing evidence was presented that, by your behavior, you have violated the ACA Code of Ethics including, "Counselors . . . avoid imposing values that are inconsistent with counseling goals" (A.4.b) and "Counselors do not condone or engage in discrimination based on age, culture . . . . sexual orientation . . ." (C.5).  Additionally, by your own testimony, you declared that you are unwilling to change this behavior.  Your stance is firm despite information provided directly to you throughout your program and discussions you acknowledge having with faculty regarding the values that motivate your behavior and those behaviors expected by the profession.  It is therefore, the Committee's unanimous decision that you be dismissed from the School Counseling Program, effective immediately.

You have ten days to appeal the Committee's decision, in writing, to the Dean of the College of Education.  The Dean may accept, reject, or modify the decision of the Committee.  The Dean's decision is final.  . . . .

Complaint, Ex. 5.  As referenced in the letter, the ACA Code of Ethics provides at Sections

A and C:

**SECTION A**
**The Counseling Relationship**

**Introduction**
Counselors encourage client growth and development in ways that foster the interest and welfare of clients and promote healthy relationships.  Counselors actively attempt to understand the diverse cultural backgrounds of the clients they serve.  Counselors also explore their own cultural identities and how these affect their values and beliefs about the counseling process.  . . . .

**A.1.  Welfare of Those Served**
        **by Counselors**

**A.1.a. Primary Responsibility**
The primary responsibility of counselors is to respect the dignity and to promote the welfare of clients.

\*     \*     \*

**A.4. Avoiding Harm and**
      **Imposing Values**

**A.4.a. Avoiding Harm**
Counselors act to avoid harming their clients, trainees, and research participants and to minimize or to remedy unavoidable or unanticipated harm.

**A.4.b. Personal Values**
Counselors are aware of their own values, beliefs, and behaviors and avoid imposing values that are inconsistent with counseling goals. Counselors respect the diversity of clients, trainees, and research participants.

\*     \*     \*

**SECTION C**
**Professional Responsibility**

**Introduction**
Counselors aspire to open, honest, and accurate communications in dealing with the public and other professionals. They practice in a non-discriminatory manner within the boundaries of professional and personal competence and have a responsibility to abide by the *ACA Code of Ethics*. . . . .

\*     \*     \*

**C.5. Nondiscrimination**
Counselors do not condone or engage in discrimination based on age, culture, disability, ethnicity, race, religion/spirituality, gender, gender identity, sexual orientation, marital status/partnership, language preference, socioeconomic status, or any basis proscribed by law. Counselors do not discriminate against clients, students, employees, supervisees, or research participants in a manner that has a negative impact on that person.

ACA Code of Ethics (2005), at 4-5, 9-10.

Ward appealed the panel's decision to Dean Polite in a March 20, 2009 letter,

arguing that she complied with the ACA Code of Ethics.

One of the main responsibilities of a counselor under the code is to "promote the welfare of clients." (A.1.a.) One of the main ways of achieving this goal is for counselors to avoid counseling relationships where they are unable "to

be of professional assistance to clients." (A.11.b). If such a situation arises, the counselor is to make an "appropriate referral." (A.11.b). The code even recognizes that a counselor's personal and moral beliefs may result in the counselor choosing "to work or not to work with terminally ill clients who wish to explore their end-of-life options." (A.9.b). If a counselor chooses not to work with such a client based on his or her personal, moral beliefs, the counselor must provide an "appropriate referral."

Complaint, Ex. 6, at 2. ACA Code of Ethics provisions A.9.b and A.11.b provide:

**A.9.  End-of-Life Care for**
**Terminally Ill Clients**

\*          \*          \*

**A.9.b.  Counselor Competence,**
**Choice and Referral**
Recognizing the personal, moral, and competence issues related to end-of-life decisions, counselors may choose to work or not work with terminally ill clients who wish to explore their end-of-life options. Counselors provide appropriate referral information to ensure that clients receive the necessary help.

\*          \*          \*

**A.11.  Termination and**
**Referral**

\*          \*          \*

**A.11.b.  Inability to Assist Clients**
If counselors determine an inability to be of professional assistance to clients, they avoid entering or continuing a counseling relationship. Counselors are knowledgeable about culturally and clinically appropriate referral resources and suggest these alternatives. If clients decline the suggested referrals, counselors should discontinue the relationship.

ACA Code of Ethics (2005), at 5-6. Dean Polite affirmed Ward's dismissal on March 26, 2009, for Ward's failure to adhere to the ACA Code of Ethics. Complaint, Ex 7.

Ward was on track to graduate in May 2010. A textbook assigned to Ward in Dr. Ametrano's class reads in part:

VALUE CONFLICTS WITH CLIENTS
If you find yourself struggling with an ethical dilemma over value differences, we encourage you to seek consultation. Supervision is often a useful way to

8

explore value clashes with clients. After exploring the issues in supervision, if you find that you are still not able to work effectively with a client, the ethical course of action might be to refer the client to another professional.

*       *       *

. . . . We hope that you would not be too quick to refer and that you would consider a referral only as the last resort.

Complaint, Ex. 8, 2-3.

## II. Motion to Dismiss or for Summary Judgment

Federal Rule of Civil Procedure 12(b)(6)[1] permits a district court to assess whether the plaintiff has stated a claim upon which relief may be granted. In making that assessment, the court must determine whether the plaintiffs' factual allegations present plausible claims. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 564, 127 S. Ct. 1955, 1970 (2007). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." Ass'n of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007) (quoting Bell Atlantic, 127 S. Ct. at 1965). To survive a Rule 12(b)(6) motion to dismiss, the plaintiffs' pleadings must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (quoting Bell Atlantic, 127 S. Ct. at 1964-65).

Federal Rule of Civil Procedure 56(c) empowers the court to render summary

---

[1] Technically, defendants' motion to dismiss is a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) in that defendants have already filed their answer to the complaint. See Fed. R. Civ. P. 12(b) (providing that a Rule 12(b)(6) motion "must be made before pleading if a responsive pleading is allowed."). However, a Rule 12(c) motion to dismiss on the pleadings is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss. See Sensations, Inc. v. City of Grand Rapids, 526 F.3d, 291, 295-96 (6th Cir. 2008).

judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue" of material fact. First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).

"Before ruling on summary judgment motions, a district court must afford the parties adequate time for discovery, in light of the circumstances of the case." Plott v. General Motors Corp., Packard Elec. Div., 71 F.3d 1190, 1195 (6th Cir. 1995). To preserve the issue that summary judgment was premature due to the need for further discovery, a party must comply with the requirements of Federal Rule 56(f), which requires the filing of an affidavit attesting to essential undeveloped facts. Id. at 1196.

### III.  Eleventh Amendment

Eleventh Amendment immunity bars recovery of money damages under 42 U.S.C. § 1983 against state officials sued in their official capacities. Kentucky v. Graham, 473 U.S. 159, 169 (1985); McKay v. Thompson, 226 F.3d 752, 757 (6th Cir. 2000) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 70-71 (1989)). The Eleventh Amendment does permit prospective injunctive relief against state officials acting in their official capacities. McKay, 226 F.3d at 757(citing Will, 491 U.S. at 70-71).

Ward concedes that she cannot recover money damages against any of the defendants in their official capacities, adding that she is properly seeking prospective injunctive and declaratory relief against the defendants in their official capacities. The court does not construe Ward's Complaint as seeking money damages against any of the defendants in their official capacities. Accordingly, the court need not dismiss or grant summary judgment on such non-pleaded claims. The court will deny the defendants' motion for dismissal or summary judgment premised on Eleventh Amendment immunity in that Ward does not seek recovery of damages against any of the defendants in their official capacities.

## IV. Qualified Immunity

Ward has also sued the several defendants in their individual capacities. Qualified immunity protects state officials sued in their individual capacities from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S.Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In resolving the issue of qualified immunity, courts are required to engage in a two-step decisional process: (1) whether the plaintiff has shown sufficient facts to make out a violation of a constitutional

right; and (2) whether the constitutional right was "clearly established" at the time of the alleged misconduct. Pearson, 129 S.Ct. at 815-16 (citing Saucier v. Katz, 533 U.S. 194, 121 (2001)). A district court enjoys "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 818.

The plaintiff bears the ultimate burden of proving "that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct." Sheets v. Mullins, 287 F.3d 581, 586 (6th Cir. 2002). Stated differently, the issue is "whether the defendants had 'fair warning' that their actions were unconstitutional." Grawey v. Drury, 567 F.3d 302, 313-14 (6th Cir. 2009). "A court should not grant summary judgment on the issue of qualified immunity if there exists a genuine issue of material fact 'involving an issue on which the question of qualified immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.'" Flint ex. rel Flint v. Kentucky Dept. of Corrections, 270 F.3d 340, 346 (6th Cir. 2001) (quoting Poe v. Hayden, 853 F.2d 418, 425-26 (1988)).

Defendants Dr. Polite, Dr. Ametrano, Dr. Francis, Dr. Marx, Dr. Callaway, Dr. Dugger, and Stanifer[2] (collectively "EMU defendants") argue that Ward is not constitutionally entitled to refuse to follow EMU's curricular requirement to abide by the

---

[2]    At the January 28, 2010 hearing, the court granted in part defendants' separate motion to dismiss or for summary judgment as to defendants Board of Regents members Wilbanks, Clack, Hawks, Incarnati, Okdie, Parker, Sidlik, Stapelton, and EMU President Dr. Martin, based on their lack of a substantial role in Ward's dismissal. The court denied the motion, without prejudice, as to Dean Polite. Accordingly, the court will not review the qualified immunity issue with respect to Dr. Martin or the eight members of the Board of Regents.

ACA Code of Ethics, and that the Practicum setting was not a "public forum," citing Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267 (1988) (holding that high school educators could censor school newspaper published as part of curriculum as long as it was reasonably related to a legitimate pedagogical purpose).  Ward responds that Ward's conduct of asking to refer the homosexual client to another student counselor-in-training was consistent with the ACA Code of Ethics, that EMU's invocation of curricular requirements is merely a pretext for purposeful religious discrimination, that the EMU defendants cannot exclude Ward from her chosen profession of counseling based on her religious beliefs, and that the EMU defendants cannot require Ward to affirm homosexual behavior contrary to her religious beliefs under a vague and overly broad EMU policy prohibiting discrimination on the basis of sexual-orientation.

### A.  Curricular Requirements

School officials are entitled to regulate the contents of speech "in any reasonable manner" where the speech is associated with legitimate curriculum requirements, including the teaching of ethical restrictions associated with a particular profession.  Hazelwood, 484 U.S. at 268, 270.  If school facilities are intended to be used for curricular requirements, "'communicative or otherwise,' then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community."  Id. at 267.

Consistent with this idea of a non-public forum, courts have traditionally given public colleges and graduate schools wide latitude "to create curricula that fit schools' understandings of their educational missions."  Kissinger v. Bd. of Trustees of Ohio State University, College of Veterinary Medicine, 5 F.3d 177, 181 (6th Cir. 1993) (citing Doherty

v. Southern College of Optometry, 862 F.2d 570, 576-66 (6th Cir. 1988)). "This judicial deference to educators in their curriculum decisions is no less applicable in a clinical setting because evaluation in a clinical course 'is no less an 'academic' judgment because it involves observation of . . . skills and techniques in actual conditions of practice, rather than assigning a grade to . . . written answers on an essay question.'" Doherty, 862 F.2d at 576-77 (quoting Board of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 95 (1978) (Powell, J., concurring)). A federal court should not override a "'genuinely academic decision' . . . unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Regents of the University of Michigan v. Ewing, 474 U.S. 214, 225 (1985). In deciding whether an academic decision was genuinely academic, or a violation of a student's right to freely exercise her religion, courts should examine whether: (1) the challenged requirement was generally applicable to all students; (2) the requirement was aimed at particular religious practices; and (3) the college had a system of particularized exemptions that allowed other students to graduate without meeting the challenged requirement. Kissinger, 5 F.3d at 179-180.

Construing the pleadings and proffered evidence in a light most favorable to Ward, it is beyond reasonable dispute that Ward's dismissal from the EMU Counseling Program arose within the curricular context of the clinical Practicum. Doherty, 862 F.2d at 576-577. It is also beyond reasonable dispute that, notwithstanding its "communicative" component, the Counseling Practicum course was not created as a public forum for counseling students or their clients. Hazelwood, 484 U.S. at 270. The Counseling Program was a "non-public" forum as a matter of law. Bell Atlantic, 127 S. Ct. at 1965; Amway Distributors, 323 F.3d

14

at 390.

This finding, however, hardly ends the analysis. An academic decision is entitled to great deference if it is based on legitimate curriculum requirements, and constitutes a "genuinely academic decision" that is relatively consistent with "accepted academic norms." Hazelwood, 484 U.S. at 268-270; Ewing, 474 U.S. at 225. Ward has alleged and come forward with evidence which would allow a reasonable fact-finder to conclude that Ward's alleged unethical "behavior" of asking Dr. Callaway whether she should refer the homosexual client to another student counselor-in-training was consistent with the ACA Code of Ethics, as well as a course textbook assigned in Dr. Ametrano's class. Bell Atlantic, 127 S. Ct. at 1965; Amway Distributors, 323 F.3d at 390. Construing the pleadings and evidence in a light most favorable to Ward, a reasonable fact-finder could also conclude that Ward acted to avoid imposing her religious beliefs on the homosexual client she was assigned. Id. Ward also expressed her view that she did not refuse to counsel the client based on his sexual orientation alone, but instead refused to counsel him on issues that would "affirm" his homosexual behavior. Ward, for example, would have counseled the client had he sought counseling about the anxiety of purchasing a home. Within this context, the court proceeds to address the defendants' qualified immunity defense in relation to Ward's six claims, cognizant that an academic decision is entitled to great deference if it is genuinely academic and consistent with accepted academic norms. Hazelwood, 484 U.S. at 268-270; Ewing, 474 U.S. at 225; Kissinger, 5 F.3d at 179-180.

## B. First Amendment Retaliation

Ward alleges and argues that she was retaliated against for expressing her religious beliefs, and that the defendants took action that would "chill" the First Amendment rights

of the ordinary person.  Thaddeus-X v. Baltter, 175 F.3d 378, 397 (6th Cir. 1999) (citing

Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998)).  A retaliation claim requires proof that:

(1) the plaintiff engaged in protected speech; (2) an adverse action was taken against the

plaintiff that would deter a person of ordinary firmness from continuing to engage in that

conduct; and (3) a causal connection showing that the adverse action was motivated at

least in part by the plaintiff's protected conduct.  Id. at 394.  "An act taken in retaliation for

the exercise of a constitutionally protected right is actionable even if the action would have

been proper if taken for a different reason."  Hoover v. Radabaugh, 307 F.3d 460, 467 (6th

Cir. 2002) (citing Bloch, 156 F.3d at 681-82).

Construing the pleadings and evidence in a light most favorable to Ward, it remains

possible for Ward to develop an evidentiary record on which reasonable fact-finders could

differ whether the reasons given for her discharge by the Formal Review Panel were

academically legitimate, or were instead a mere pretext to retaliate against Ward for

expressing her religious beliefs in class, to Professor Callaway when asking if she should

reassign the homosexual client, to the panel and Dr. Francis, and to Dean Polite.  Ward has

placed into reasonable dispute whether her alleged unethical "behavior" of asking Dr.

Callaway whether she should refer the homosexual client to another student legitimately

constituted "imposing values that are inconsistent with counseling goals," "discrimination

based on . . . sexual orientation," or behavior inconsistent with "those behaviors expected

by the profession."  March 12, 2009 dismissal letter, Complaint, Ex. 5.  The court reiterates

that Ward's alleged conduct of asking whether she should refer the homosexual client to

another student counselor before she even met the client, and more importantly before the

client met her, could reasonably be found to be consistent with the ACA Code of Ethics and

the course textbook. See ACA Code of Ethics (2005), Sections A.4.a, A.4.b, A.11.b, supra. Ward avoided imposing her religious beliefs on the homosexual client by asking for a referral to another student counselor.  Ward explained that she did not ask whether she should refer the client because of his status as a homosexual, but because she could not counsel him concerning his homosexual relationship.

The EMU defendants' true motivations for dismissing Ward from the Counseling Program raise a factual issue of intent for which "summary judgment is particularly inappropriate" on the grounds of qualified immunity.  Hoover 307 F.3d at 467 (citing Marohnic v. Walker, 800 F.2d 613, 617 (6th Cir. 1986)).  Ward has placed in issue whether she violated the challenged requirements for the Counseling Program – imposing values consistent with counseling goals, no discrimination based on sexual orientation, and behaviors consistent with those expected by the counseling profession – by asking Dr. Callaway whether she should refer the homosexual client, or whether she was retaliated against for expressing her religious views about homosexual conduct outside of the Practicum course i.e. in the classroom and at the March 10, 2009 hearing.  Bell Atlantic, 127 S. Ct. at 1965; Amway Distributors, 323 F.3d at 390.  The EMU defendants do not argue that Ward could have been legitimately discharged for expressing her religious views in the classroom, and indeed maintain that Ward received high marks throughout her classroom studies.  Based on the pleadings and proffered evidence now before the court, it cannot be determined as a matter of law whether the EMU defendants' act of dismissing Ward from the Counseling Program clearly violated Ward's right to be free from First Amendment retaliation.  Kentucky Dept. of Corrections, 270 F.3d at 346; Hoover, 307 F.3d at 467.  Defendants are not entitled to dismissal or summary judgment of Ward's First

Amendment retaliation claim for damages based on qualified immunity.  Bell Atlantic, 127 S. Ct. at 1965; Amway Distributors, 323 F.3d at 390.

### C.  First Amendment Free Speech

"[T]he Hazelwood framework is applicable in a university setting for speech that occurs in a classroom as part of a class curriculum."  Axson-Flynn v. Johnson, 356 F.3d 1277, 1289 (10th Cir. 2004) (citing inter alia as persuasive Settle v. Dickinson County Sch. Bd., 53 F.3d 152 (6th Cir. 1995)).  In such context, a university's decision to compel speech will be upheld as long as the decision was "reasonably related to legitimate pedagogical concerns."  Axson-Flynn, 356 F.3d at 1290 (quoting Fleming v. Jefferson County Sch. Dist. R-1, 298 F.3d 918, 926 (10th Cir, 2002) (quoting Hazelwood, 484 U.S. at 273)).  "So long as the teacher limits speech or grades speech in the classroom in the name of learning and not as a pretext for punishing the student for her . . . religion . . . , the federal courts should not interfere."  Axson-Flynn, 356 F.3d at 1293 (quoting Settle, 53 F.3d at 155-56).

The Tenth Circuit concluded in Axson-Flynn that, although the university's actor-training script was "school-sponsored speech" in a non-public forum subject to a rational basis test under Hazelwood, the act of compelling the plaintiff student to read offensive words from the script against her Mormon religious beliefs could violate her free speech rights if the faculty's judgment substantially departed from accepted academic norms and evidenced a pretext for punishing the student for her religious beliefs.  Axson-Flynn, 356 F.3d at 1293 (quoting Settle, 53 F.3d at 155-56).

As with Ward's retaliation claim, the EMU defendants' true motivations for dismissing Ward are issues of intent for which summary judgment is particularly inappropriate on the grounds of qualified immunity.  Hoover 307 F.3d at 467.  The EMU defendants are not

entitled to dismissal or summary judgment of Ward's First Amendment free speech claim for damages based on qualified immunity. Bell Atlantic, 127 S. Ct. at 1965; Amway Distributors, 323 F.3d at 390.

The court notes that Ward also alleges and argues that the EMU defendants engaged in "viewpoint discrimination," citing Rosenberger v. Rector and Visitors of University of Virginia, 515 U.S. 819 (1995) (holding denial of funding to university Christian student organization for printing its newspaper constituted "viewpoint discrimination" in violation of First Amendment), Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384 (1993) (holding school district violated Free Speech Clause by denying church access to premises solely because of religious content of proposed film, finding "viewpoint discrimination"), and Papish v. Bd. of Curators of the University of Missouri, 410 U.S. 667 (1973) (holding expulsion of student for distributing newspaper containing political cartoon on campus was not "viewpoint neutral," and therefore did not fall within university's "legitimate authority to enforce reasonable regulations as to the time, place and manner of speech and its dissemination"). These cases did not involve a Hazelwood non-public forum associated with curricular requirements, as discussed in Section IV, A, supra. See Rosenberger, 515 U.S. at 830 (citing Lamb's Chapel, 508 U.S. at 392-93 for the proposition that, once the state opens a limited public forum, it may not discriminate against speech based on its viewpoint); Papish, 410 U.S. at 667, 670-71 (finding expulsion of student for publicly selling newspaper on campus violated First Amendment's protection against content discrimination). While the court finds Rosenberger, Lamb's Chapel, and Papish unpersuasive authority with respect to the instant qualified immunity analysis, as stated, the EMU defendants are not entitled to qualified

immunity as to Ward's free speech claim seeking damages.  <u>Axson-Flynn</u>, 356 F.3d at 1293; <u>Hoover</u> 307 F.3d at 467; <u>Bell Atlantic</u>, 127 S. Ct. at 1965; <u>Amway Distributors</u>, 323 F.3d at 390.

## D. First Amendment Free Exercise Clause

Ward alleges and argues that the EMU defendants attempted to compel her to affirm homosexual behavior, contrary to her religious beliefs, in violation of the Free Exercise Clause of the First Amendment.  "The Supreme Court has long held that the government cannot compel the speech of private actors."  <u>Axson-Flynn</u>, 356 F.3d at 1283-84 (citing <u>inter</u> <u>alia</u> <u>W. Va. State Bd. of Educ. v. Barnette</u>, 319 U.S. 624, 642 (1943)).  In the context of the Free Exercise Clause, "a law that is neutral and of general applicability need not be justified by a compelling state interest even if the law has the incidental effect of burdening a particular religious practice."  <u>Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520, 531 (1993).  However, "[a] law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored ro advance that interest."  <u>Id</u>.  "A rule that is discriminatorily applied is not a neutral rule of general applicability."  <u>Axson-Flynn</u>, 356 F.3d at 1294.  Thus, a university's act of compelling speech will be upheld under the Free Exercise Clause only as long as the rule underlying the decision was not "discriminatorily motivated and applied[.]"  <u>Id</u>. at 1294.

Again, as with Ward's retaliation and free speech claims, the EMU defendants' true motivations for dismissing Ward are issues of intent for which summary judgment is inappropriate on the grounds of qualified immunity.  <u>Hoover</u> 307 F.3d at 467.  Defendants are not entitled to dismissal or summary judgment of Ward's First Amendment Free Exercise Clause claim seeking damages.  <u>Bell Atlantic</u>, 127 S. Ct. at 1965; <u>Amway</u>

Distributors, 323 F.3d at 390.

Ward also alleges and argues that the EMU defendants cannot exclude Ward from the counseling profession based on her religious beliefs, citing McDaniel v. Paty, 435 U.S. 618 (1978) (finding Tennessee constitutional provision barring ministers from serving as delegates to constitutional convention violated Free Exercise Clause because it conditioned constitutional right to free exercise of religion on surrender of constitutional right to seek political office); Sherbert v. Verner, 374 U.S. 398, 403-404 (1963) (7-2) (finding state violated First Amendment Free Exercise Clause and Fourteenth Amendment Due Process Clause by denying unemployment benefits to Seventh Day Adventist based on the applicant's refusal to work on Saturdays in violation of her religion); Keyishian v. Bd. of Regents of University of State of New York, 385 U.S. 589 (1967) (striking down as vague for First Amendment purposes statute requiring teachers to sign "loyalty oath" attesting they are not Communists); Baird v. State Bar of Arizona, 401 U.S. 1, 7 (1971) (striking requirement that bar applicant answer whether he had been a member of the Communist party, holding that First Amendment forbids state from inquiring about an applicant's "views or associations solely for the purpose of withholding a benefit because of what he believes").  Aside from the fact that these cases did not arise in a non-public Hazelwood forum, the cases also raise the unaddressed question of whether a state university student enjoys a constitutional right to a degree.  The court need not further address these cases in the context of the EMU defendants' qualified immunity challenge, however, having already determined that the EMU defendants are not entitled to dismissal or summary judgment of Ward's First Amendment Free Exercise Clause claim for damages based on qualified immunity.  Axson-Flynn, 356 F.3d at 1294; Hoover 307 F.3d at 467; Bell Atlantic,

127 S. Ct. at 1965; <u>Amway Distributors</u>, 323 F.3d at 390.

### E.  Fourteenth Amendment Equal Protection

Ward alleges and argues that the EMU defendants "targeted" her fundamental right to free speech and free exercise of religion, and treated similarly situated students differently.  Ward asserts that the EMU defendants cannot show under a "strict scrutiny" analysis that their classification of her based on her religious beliefs is precisely tailored to further a compelling state interest, citing <u>Plyler v. Doe</u>, 457 U.S. 202, 217-18 (1982).

<u>Plyler</u> did not involve a <u>Hazelwood</u> non-public forum associated with curricular requirements.  <u>See</u> <u>Plyler</u>, 457 U.S. at 205, 230 (finding Texas statute denying undocumented children the free public education provided to United States citizens and legally admitted aliens violated Fourteenth Amendment Equal Protection Clause absent a showing that the denial furthered some substantial state interest).  Under a <u>Hazelwood</u> analysis, in deciding whether Ward's dismissal was a genuinely academic decision or a violation of her fundamental right to free speech, this court must consider whether the EMU defendants' application of the ACA Code of Ethics was aimed at Ward's particular religious view regarding homosexuality.  <u>Kissinger</u>, 5 F.3d at 179-180.  The court must also ultimately decide whether the ACA Code of Ethics was generally applied to all students.  <u>Id</u>.  As reasoned in the previous Sections, a question of fact remains whether the EMU defendants used the ACA Code of Ethics as a pretext to discriminate against Ward for her religious views, precluding summary judgment on the issue of qualified immunity.  <u>Hoover</u>, 307 F.3d at 467.  If a reasonable fact-finder concluded that the EMU defendants classified Ward as unfit due to her religious views as opposed to a genuinely academic concern, it may be possible for that same fact-finder to conclude that the EMU defendants denied

Ward her Fourteenth Amendment right to equal protection of law. See Plyler, 457 U.S. at 216-17 (recognizing that the Equal Protection Clause protects against classifications that unlawfully impinge upon a "fundamental right"). The court does not decide today what Fourteenth Amendment standard would apply *if* the fact-finder determined that the EMU defendants illegitimately dismissed Ward from the Counseling Program based on their classification of her religious views, and in violation of the Hazelwood standards. Kissinger, 5 F.3d at 179-180. Due to the remaining disputed issue of fact as to the EMU defendants' true motivation and intent, dismissal or summary judgment of Ward's equal protection claims for damages premised on qualified immunity is not warranted. Hoover, 307 F.3d at 467.

### F. Fourteenth Amendment Due Process Clause

Ward argues that EMU's policy incorporating the ACA Code of Ethics prohibiting "discrimination based on . . . sexual orientation" constitutes a facially vague and overbroad "speech code" that "chills" or inhibits expression that is constitutionally protected, citing DeJohn v. Temple University, 537 F.3d 301 (3rd. Cir. 2008) (holding university's sexual harassment policy was facially overbroad by prohibiting free discussion of gender issues in classrooms), and Doe v. University of Michigan, 721 F.Supp. 852 (E.D. Mich. 1989) (Cohn, J.) (holding university's discrimination and harassment policy was facially vague and overbroad by prohibiting protected expression in classroom). Consistent with the analysis herein, it remains in reasonable dispute whether Ward was legitimately dismissed from the Counseling Program based on reasonable restrictions placed upon her in the clinical setting of the Practicum, Hazelwood, 484 U.S. at 268-270, Doherty, 862 F.2d at 576-77, or whether Ward was dismissed for her classroom discussions of her religious beliefs based

on a pretext of sexual orientation discrimination. The EMU defendants are not entitled to dismissal or summary judgment of Ward's due process claims for damages on the grounds of qualified immunity. <u>Hoover</u>, 307 F.3d at 467.

### G. First Amendment Establishment Clause

Ward alleges and argues that the EMU defendants owed a duty to accommodate her religious beliefs under the Establishment Clause of the First Amendment, citing <u>Lynch v. Donnelly</u>, 465 U.S. 668 (1984) (holding that city did not violate Establishment Clause by including a nativity scene in a city holiday display). Again, <u>Lynch</u> was not decided under the framework of <u>Hazelwood</u> and the non-public forum of a clinical classroom setting. <u>Hazelwood</u>, 484 U.S. at 268-270, <u>Doherty</u>, 862 F.2d at 576-77. Nonetheless, action taken "motivated wholly by religious considerations," and absent a secular purpose, may violate the Establishment Clause of the First Amendment. <u>Lynch</u>, 465 U.S. at 680. Whether the EMU defendants dismissed Ward for legitimate academic reasons, or were wholly motivated by consideration of Ward's religious views regarding homosexuality, remains in genuine dispute. Accordingly, dismissal or summary judgment of Ward's claims for damages under the Establishment Clause is not merited under the doctrine of qualified immunity. <u>Hoover</u>, 307 F.3d at 467.

### IV. Plaintiff's Rule 56(f) Motion

Having determined on the instant record that the EMU defendants are not entitled to dismissal or summary judgment of Ward's damages claims pursuant to the doctrine of qualified immunity, Ward's motion to deny the motion for summary judgment pursuant to Rule 56(f) will be denied as moot.

### V. Conclusion

Ward has sufficiently plead and come forward with evidence that the EMU defendants' act of dismissing Ward violated First and Fourteenth Amendment rights so clearly established that a reasonable official in their position would have clearly understood that they were under an affirmative duty to refrain from such conduct. <u>Sheets</u>, 287 F.3d at 586. Genuine issues of material fact as to the EMU defendants' true motivations for dismissing Ward preclude dismissal or summary judgment of Ward's damages claims under the doctrine of qualified immunity. <u>Kentucky Dept. of Corrections</u>, 270 F.3d at 346; <u>Hoover</u>, 307 F.3d at 467. Defendants Dr. Polite's, Dr. Ametrano's, Dr. Francis', Dr. Marx's, Dr. Callaway's, Dr. Dugger's, and Stanifer's motion for dismissal or summary judgment premised on qualified immunity is hereby DENIED. The EMU defendants' motion for dismissal or summary judgment premised on Eleventh Amendment immunity is hereby DENIED as Ward has not alleged a claim for damages against any defendant in their official capacity. Ward's Rule 56(f) motion is hereby DENIED as MOOT.

SO ORDERED.

Dated: March 24, 2010

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on March 24, 2010, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk

25