UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JULEA WARD,

        Plaintiff,

vs.

Case No. 09-CV-11237
HON. GEORGE CARAM STEEH

THE MEMBERS OF THE BOARD OF
CONTROL OF EASTERN MICHIGAN UNIVERSITY, et al.,

        Defendants.

_____/

## ORDER DENYING DEFENDANTS POLITE'S, AMETRANO'S, MARX'S, FRANCIS'S, STANIFER'S, DUGGER'S, AND CALLAWAY'S MOTION FOR JUDGMENT ON THE PLEADINGS OR SUMMARY JUDGMENT BASED ON QUASI-JUDICIAL IMMUNITY (# 58)

Defendants Eastern Michigan University ("EMU") Dean of the College of Education Dr. Polite, Professors of Counseling and Education Dr. Ametrano, Dr. Francis, Dr. Marx, Dr. Callaway, and Dr. Dugger, and Formal Review Committee student member defendant Paula Stanifer, move for judgment on the pleadings or for summary judgment on the basis of quasi-judicial immunity as to former EMU Counseling Graduate Student Julea Wards' claims for damages arising from Ward's dismissal from EMU's Counseling Graduate Program allegedly due to her religious beliefs on the subject of homosexuality, and in violation of the First and Fourteenth Amendments. Oral argument would not significantly aid the decisional process. Pursuant to E.D. Mich. Local R. 7.1(e)(2), it is ORDERED that the motion be resolved without oral argument.

## I. Background

A more detailed background of this lawsuit is set forth in the court's March 24, 2010 Order denying the defendants' motion to dismiss or for summary judgment due to qualified immunity and the Eleventh Amendment. During a Counseling Program Practicum Course for students-in-training, Ward's third client sought counseling regarding a homosexual relationship. After reading the client's file, but before meeting the client, Ward asked her supervisor, Professor Callaway, whether the client should be referred to another student because Ward could not affirm the client's homosexual behavior. Professor Callaway directed that the client be referred to another student counselor, then informed Ward that she would not be assigned any more clients, and that Callaway would be requesting an informal disciplinary review before herself and Ward's Advisor, defendant Dugger, as to whether Ward had violated certain policies set forth in "The Counseling Student Handbook." After a February 3, 2009 informal review before Callaway and Dugger, Ward chose to pursue a formal review hearing. Ward was informed in a February 19, 2009 letter that the formal review was "disciplinary in nature," and that she may be disciplined for "a violation of . . . the [American Counseling Association ("ACA")] Code of Ethics and or when a student exhibits a pattern of recurring behavior which may include . . . [u]nethical, threatening or unprofessional conduct" and "[f]ailure to tolerate different points of view[.]" Complaint, Ex. 2. Ward's March 10, 2009 Formal Review Committee ("FRC") consisted of Professors Ametrano, Francis, and Marx, and student Stanifer. Professors Callaway and Dugger testified at the formal review. Following the formal review, the FRC issued a March 12, 2009 unanimous decision that "clear and convincing evidence" had been presented that Ward "violated the ACA Code of Ethics including, 'Counselors . . . avoid imposing values that are inconsistent with counseling goals' (A.4.b) and 'Counselors do not condone or

2

engage in discrimination based on age, culture . . . . sexual orientation . . .' (C.5)." Complaint, Ex. 5. Ward was informed that she had ten days to file a written appeal of the FRC's decision to Dean Polite, who could accept, reject, or modify the decision. Id. Ward appealed the FRC's decision to Dean Polite in a March 20, 2010 letter, arguing that she had complied with the ACA Code of Ethics. Complaint, Ex. 6. Dean Polite affirmed the FRC's decision on March 26, 2009. Complaint, Ex. 9.

Professors Ametrano, Francis, and Marx, and student Stanifer, argue they are entitled to quasi-judicial immunity against any award of damages as members of the FRC, a quasi-judicial body. Dean Polite argues he is entitled to quasi-judicial immunity in his appellate role of reviewing the FRC's decision. Professors Callaway and Dugger argue they are entitled to quasi-judicial immunity as witnesses at the quasi-judicial FRC hearing.

## II. Motion for Judgment on the Pleadings or for Summary Judgment

A motion for judgment on the pleadings under Rule 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). Sensations, Inc. v. City of Grand Rapids, 526 F.3d, 291, 295-96 (6th Cir. 2008). In determining whether to dismiss, the court must assess whether the plaintiffs' factual allegations present plausible claims. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 564, 127 S. Ct. 1955, 1970 (2007). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." Ass'n of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007) (quoting Bell Atlantic, 127 S. Ct. at 1965).

A court is authorized to grant summary judgment under Federal Rule of Civil

Procedure 56(c) "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences are construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue" of material fact. First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).

### III. Quasi-Judicial Immunity

The Supreme Court in Wood v. Strickland, 420 U.S. 308 (1975) held "in the specific context of school discipline . . . a school board member is not [absolutely] immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." Id. at 322. The Court

4

reasoned that "absolute immunity would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations." Id. at 320.

Three years later, the Supreme Court extended absolute quasi-judicial immunity to federal hearing examiners in the Executive Branch because the examiner's judgments had the "functional comparability" of judgments issued by judges in the Judicial Branch. Butz v. Economou, 438 U.S. 478, 512 (1978). The Court stressed that quasi-judicial immunity was dependent upon "the special nature of their responsibilities," and not upon their "particular location within the Government[.]" Id. at 511.

> [T]he safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct. The insulation of the judge from political influence, the importance of precedence in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious actions by judges. Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decision process, there is a less pressing need to correct constitutional error.

Id. at 512. The Butz court found "that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from damages," noting that the federal Administrative Procedure Act ("APA") provided many of the safeguards available in the judicial process. Id. at 512-513. The Court also noted that, prior to the adoption of the APA, "there was considerable concern that persons hearing administrative cases at the trial

level could not exercise independent judgment because they were required to perform prosecutorial and investigative functions as well as their judicial work, and because they were subordinate to executive officials within the agency[.]" Id. at 513-14 (internal citations omitted). On concluding that federal hearing examiners were entitled to quasi-judicial immunity from damages, the Butz court explained that "[t]hose who complain of error in such proceedings must seek agency or judicial review." Id. at 514.

Relying on Butz, the Sixth Circuit extended absolute quasi-judicial immunity to members of a state medical licensing board. Watts v. Burkhart, 978 F.2d 269 (6th Cir. 1992). The defendant medical board members met their burden of showing that: (1) their positions were akin to judges; (2) the potential for vexatious lawsuits was great; and (3) enough safeguards existed to protect the constitutional rights of a physician facing suspension or revocation of his medical license. Id. at 278 (citing Bettencourt v. Bd. of Registration in Medicine, 904 F.2d 772, 784 n. 15 (1st Cir. 1990)). The Watts court noted that every one of the five members of the medical licensing board was a professional, and each was required by Tennessee law to be a duly licensed physician with at least six years of experience in the practice of medicine. Id. at 275. By statute, the board members were also required to conduct all disciplinary hearings in accordance with Tennessee's Uniform Administrative Procedures Act, which was found to provide comparable safeguards as those found in the federal APA. Id. The board's preliminary, procedural, or intermediate actions were "immediately reviewable [by the Chancery Court] if review of the final decision would not provide an adequate remedy." Id. at 276 (citing Tenn. Code Ann. § 4-5-322(a)(1)). The Watts court was also informed that the Chancery Court was permitted to "go outside the administrative record in considering claims of bias, racial prejudice, and the

6

like."  Id.

Watts distinguished Cleavinger v. Saxner, 474 U.S. 193 (1985), a case in which the Supreme Court declined to extent absolute quasi-judicial immunity to Bureau of Prisons employees who served on a prison disciplinary committee.  Watts, 978 F.2d at 276.

> . . . . The disciplinary committee members lacked the independence that characterizes federal or state judges . . . and their function was not "a 'classic' adjudicatory one . . . ." [Cleavinger, 474 U.S.] at 203.
>
> "They are all employees of the Bureau of Prisons and they are the direct subordinates of the warden who reviews their decision.  They work with the fellow employee who lodges the charge against the inmate upon whom they sit in judgment.  The credibility determination they make often is one between a co-worker and an inmate.  They thus are under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee.  [Citation omitted].  . . . .

Watts, 978 F.2d at 276 (quoting Cleavinger, 474 U.S. at 204).

In denying the members of the prison disciplinary hearing quasi-judicial immunity, the Cleavinger Court determined that the members were not, in reality, "independent," nor were they professional hearing officers.  Cleavinger, 474 U.S. at 203-204.  The Cleavinger Court also found that a prisoner facing discipline was not afforded certain procedural safeguards contained in the ADA:

> . . . . The prisoner was to be afforded neither a lawyer nor an independent nonstaff representative.  There was no right to compel the attendance of witnesses or to cross-examine.  There was no right to discovery.  There was no cognizable burden of proof.  No verbatim transcript was afforded.  Information presented often was hearsay or self-serving.  The committee members were not truly independent.  In sum, the members had no identification with the judicial process of the kind and depth that has occasioned absolute immunity.
>
> Qualified immunity, however, is available to these committee members. . . . .

Id. at 206.  "Paramount among . . . [the] safeguards" of protecting participants and the

integrity of the decision making process "is the right of judicial review." Corey v. New York Stock Exchange, 691 F.2d 1205, 1209-10 (6th Cir. 1982) (citing inter alia Butz, 438 U.S. at 512-14, and holding that NYSE arbitrators were entitled to absolute immunity "for acts arising out of the scope of their arbitral functions and within their jurisdiction in contractually agreed upon arbitration proceedings.").

The Sixth Circuit more recently denied absolute quasi-judicial immunity to a university dean of graduate studies acting as a grievance committee's hearing officer, and the university president who affirmed the committee's assessment that a mathematics professor had been properly denied tenure. Purisch v. Tennessee Technological University, 76 F.3d 1414, 1419, 1422 (6th Cir. 1996). Citing Watts, 978 F.2d at 278, the Purisch court found that the university grievance committee did not possess the necessary independence because its members were university employees, and were subordinate to the university president who chose the committee's members and reviewed their decision. Purisch, 76 F.3d at 1422. Although the grievant was permitted to have an advisor at the hearing, the advisor was not permitted to act as an advocate, and therefore the grievant "did not have the same right to counsel as in a judicial proceeding." Id. at 1422. The grievant was also not permitted to cross-examine witnesses. Id. The committee did not have the power to subpoena witnesses. Id. "Finally, the Tennessee Tech grievance policy indicates that it is not subject to the requirements of the Tennessee Administrative Procedures Act, and provides only for an appeal to the university chancellor, not to the courts." Id.

Construing the pleadings and evidence in a light most favorable to defendants FRC members Professors Ametrano, Francis, and Marx, and student Stanifer, Dean Polite in his

8

appellate role, and Professors Callaway and Dugger as FRC witnesses, the court finds these defendants are not entitled to absolute quasi-judicial immunity. The FRC members were not, in reality, independent decision-makers insulated from political or outside influence. Butz, 438 U.S. at 512; Cleavinger, 474 U.S. at 203-204; Purisch, 76 F.3d at 1422. Professors Ametrano, Francis, and Marx were chosen to serve two-year terms on the FRC by other EMU professors, their peers. Each of the Professors on the FRC was employed by EMU. Fellow employee Professor Callaway presented the disciplinary claims against Ward to the FRC, while fellow employee Professor Dugger presented testimony to the FRC supportive of disciplinary action. Obvious pressure existed for the defendant EMU Professors on the FRC to rule in favor of the positions advanced by their fellow EMU Professors Callaway and Dugger. Cleavinger, 474 U.S. at 203-204; Purisch, 76 F.3d at 1422. FRC student member Stanifer has not yet attained professional status as a counselor, and was likewise susceptible to pressure to side with the EMU Professors. Id; Watts, 978 F.2d at 275. The FRC members could not reasonably be viewed as professional adjudicators. Cleavinger, 474 U.S. at 203-204; Watts, 978 F.2d at 275. Notwithstanding the tenured positions held by Professors Ametrano and Francis, and the fact that the FRC members were not appointed by EMU's Dean or President, the FRC members did not possess the independence that characterizes state or federal judges; their positions on the FRC were not akin to judges. Cleavinger, 474 U.S. at 203; Purisch, 76 F.3d at 1422; Watts, 978 F.2d at 278.

Defendants Ametrano, Francis, Marx, Stanifer, Polite, Callaway and Dugger have also failed to demonstrate that sufficient safeguards exist with respect to FRC disciplinary proceedings, and appeals therefrom, to protect the constitutional rights of EMU students

facing disciplinary action. Butz, 438 U.S. at 511; Watts, 978 F.2d 269, 278. In addition to the lack of judicial independence, the record indicates that: the FRC was not bound by any published or otherwise available precedent; FRC witnesses were not sworn under oath and subject to the possible penalty of perjury; a student facing disciplinary charges before the FRC could not be represented by an advisor or an attorney that was not affiliated with EMU; the FRC did not have the authority to compel the attendance of witnesses; and the FRC lacked the authority to authorize discovery. Butz, 438 U.S. at 512; Cleavinger, 474 U.S. at 203, 206; Purisch, 76 F.3d at 1422. The FRC members and Dean Polite were not bound by the Counseling Student Handbook to abide by the procedures of the Michigan or federal APA. Butz, 438 U.S. at 512-513; Watts, 978 F.2d at 275; Purisch, 76 F.3d at 1422. Disciplinary decisions by the FRC, final appellate decisions by the Dean of the College of Education, and separate appeals to the EMU Graduate School for readmission into the Graduate School, are not subject to judicial review. Butz, 438 U.S. at 512, 514; Purisch, 76 F.3d at 1422; Watts, 978 F.2d at 276; Corey, 691 F.2d at 1209-10. On the whole record, the safeguards that are provided for in the Counseling Student Handbook – including but limited to a student's right to an audiotape copy of the FRC hearing, the right to timely written notices of hearings and decisions, the right to remain silent or speak on his own behalf, the right to present evidence and call witnesses, the right to an EMU affiliated advisor or legal counsel, the right to challenge the prejudice or impartiality of an FRC member at the hearing, and the right to question "within reason" anyone presenting information at the hearing – are insufficient to protect the constitutional rights of students facing disciplinary action. Watts, 978 F.2d at 278. The safeguards provided for in the Counseling Student Handbook, as compared to the absence of other recognized

safeguards as set forth above, do not warrant precluding a damages remedy for EMU students who prove they were subjected to constitutional deprivations. Wood, 420 U.S. at 320; Cleavinger, 474 U.S. at 206. The defense of qualified immunity, not absolute immunity, is available to the defendant FRC members, Dean Polite, and Professors Callaway and Dugger. Id.

The instant defendants have not shown that, without absolute quasi-judicial immunity, there is a great potential for vexatious lawsuits. Watts, 978 F.2d at 278. Without the ability under the Counseling Student Handbook to challenge the constitutionality of disciplinary decisions issued by the FRC and the Dean of the College of Education in some appellate judicial forum, students must raise their constitutional claims in separate lawsuits. As this count has determined, the written decisions of the FRC members and Dean Polite in his appellate role are not "functionally comparable" to judgments issued by courts of law. Butz, 438 U.S. at 512. As the defendants argue, the decision in Woods does not itself bar school officials from acquiring quasi-judicial immunity. The defendants here have simply failed to show on the facts of this case that quasi-judicial immunity is warranted. Twombly, 550 U.S. at 564; Amway Distributors, 323 F.3d 390.

Consistent with the conclusion that neither Dean Polite nor the defendant FRC members are entitled to quasi-judicial immunity, defendants Callaway and Dugger are likewise not entitled to quasi-judicial immunity. As reasoned, the FRC disciplinary proceeding at which Callaway and Dugger testified was not a quasi-judicial proceeding.

## IV. Conclusion

For the reasons set forth above, defendants Polite's, Ametrano's, Francis's, Marx's, Callaway's, Dugger's, and Stanifer's motion for judgment on the pleadings or for summary

judgment on the basis of quasi-judicial immunity is hereby DENIED.

SO ORDERED.

Dated: April 5, 2010

> s/George Caram Steeh
> GEORGE CARAM STEEH
> UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on April 5, 2010, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk