UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JULEA WARD,

                    Plaintiff,

                                                    Case No. 09-CV-11237
vs.                                                 HON. GEORGE CARAM STEEH

ROY WILBANKS, et al.,

                    Defendants.
_____/

OPINION AND ORDER DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT [DOC. # 79] AND GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC # 82]

        This matter is before the court on motions for summary judgment filed by plaintiff,

Julea Ward, and defendants, Eastern Michigan University officials.  The court held oral

argument on the motions on June 24, 2010.  For the reasons stated in this opinion and

order, plaintiff's motion for summary judgment is DENIED and defendants' motion for

summary judgment is GRANTED.

FACTUAL BACKGROUND

        In 2006, plaintiff applied and was admitted to the Master's Degree program (the

"Program") in counseling at Eastern Michigan University ("EMU" or "University"),

endeavoring to pursue a degree that would allow her to become a high school

counselor.  The Program requires that students complete not only traditional

lecture/discussion courses, but also a "Practicum" course, which involves actual

counseling of real clients in a clinic operated by the University and supervised by

University faculty.  The Practicum course and Student Handbook require that all students in the Program abide by the American Counseling Association ("ACA") Code of Ethics and Standards of Practice and the American School Counselor Association ("ASCA") Ethical Standards for School Counselors.  In order to maintain its accreditation through the Council for Accreditation of Counseling and Related Educational Programs ("CACREP"), the students must have "curricular experiences and demonstrated knowledge" in the ACA and ASCA Ethics Codes.  Defendants assert that CACREP accreditation is integral to maintaining the Program's status as a respected post-secondary counseling program.  Moreover, the State of Michigan approves CACREP accreditation standards and requires professional counselors and school counselors to be trained in ethics.  M.C.L.A. §§ 338.1753(4), 333.18107(1)(b).

Plaintiff strictly adheres to orthodox Christian beliefs, a fact which she shared in her application to the Program.  Prior to the events instigating this litigation, plaintiff openly shared her view of homosexuality as being morally wrong during classroom discussion and in her coursework.  For example, plaintiff turned in a paper for a class involving the potential for religion-based values conflicts with clients for which she received a perfect score. Specifically, she wrote, "[i]n situations were [sic] the value differences between a counselor and client are not amenable, 'standard practice' requires that the counselor refer his/her client to someone capable of meeting their needs."  Although plaintiff claims that her professors' "disagreeable" reactions to her opinions "shut down" her point of view, she nonetheless received A's in all of her classes.

Plaintiff enrolled in the Practicum in January 2009. The controversy arose when plaintiff encountered a client who sought counseling regarding depression, but who had previously been counseled about his homosexual relationship. After plaintiff reviewed the file approximately two hours before the scheduled appointment, she asked her supervisor, Dr. Callaway, under whose license she was practicing, whether she should refer the client to another counselor because she could not affirm the client's homosexual behavior. Time constraints precluded a full discussion of the conflict, but given her desire not to harm the client, Dr. Callaway opted to cancel the appointment and reschedule it for a later date with a different counselor.

Dr. Callaway later informed plaintiff that she would not be assigned any more clients, and that she, Callaway, would be requesting an informal review before herself and plaintiff's advisor, Professor Dugger, as to whether she had violated University and ACA policies prohibiting "unethical, threatening, or unprofessional conduct," an "inability to tolerate different points of view," "imposing values that are inconsistent with counseling goals," and "discrimination based on . . . sexual orientation." Defendants stated that this informal review was scheduled due to plaintiff's performance in Praticum and in order to discuss her obligation to provide counseling based on the client's values and not those of the counselor. (Tr. of Formal Review, 4:19-5:17). Dr. Dugger insists that during the review, she repeatedly assured plaintiff that she was "not incompetent." (Feb. 4 Email String Among Callaway, Dugger, & Tracy). A letter dated February 2, 2009 documents the informal review:

> During the meeting, Dr. Callaway expressed a serious concern about
> your performance in practicum. Specifically, she indicated that you
> have communicated bias against clients who identify as lesbian, gay

or bisexual and that you have refused to accept a gay person as a client in practicum with the explanation that counseling gay people about relationship issues violates your religious beliefs. Dr. Callaway explained that the EMU counseling program, in accordance with the ethical standards of the counseling profession (American Counseling Association, 2005), requires that students demonstrate in practicum the ability to consistently set aside their personal values or beliefs systems and work with the value system of the client. She stated that your refusal to see a client presenting with concerns about his gay relationship signified an unwillingness or inability on your part to meet this expectation.

At the end of the informal review, plaintiff was given the choices of: (1) completing a "remediation program" directed; (2) voluntarily leaving the Counseling Program; or (3) requesting a formal hearing. The remediation program was contingent on "Ms. Ward's recognition that she needed to make some changes." (Tr. of Formal Review, 8:4-7). Plaintiff "communicated an attempt to maintain this belief system and those behaviors," refused to participate in the remediation program, and instead chose to have a formal hearing. Id.

A formal hearing was held on March 10, 2009 and was attended by Professors Callaway and Dugger. Others serving on the hearing panel were Professors Ametrano, Francis, and Marx, and student representative Stanifer. During the review, plaintiff said that while she objected to counseling homosexual clients on their same-sex relationships, she would counsel them on any other issue; moreover, she refused to affirm any behavior that "goes against what the Bible says." In addition, plaintiff stated that she disagreed with the ACA's prohibition on reparative therapy (viz., therapy targeted at changing a homosexual individual's sexual orientation), but that she would comply with such rules. Also during the review, Dr. Francis engaged plaintiff in the following "theological bout":

Francis: [I]s anyone more righteous than another before God?
Ward: Is anyone more righteous than another before God?
Francis: Yeah.
Ward: God says that we're all the same.
Francis: Yeah.
Ward: That's what God says.
Francis: OK, so, if that's your direction . . . how does that then fit with your belief that . . . and I understand that you're not, because the word you keep using is affirming, you're not, which comes across as I'm not going to condone that behavior, I'm not going to affirm it, so I'm not going to go that way.
Ward: OK.
Francis: If that's true, then aren't you on equal footing with [persons engaging in homosexual behavior]? With, with everyone?
Ward: Absolutely, Dr. Francis.
Francis: OK. Then doesn't that mean that you're all in the same boat and shouldn't [persons engaging in homosexual behavior] be accorded the same respect and honor that God would give them?
Ward: Well, what I would say is, again, I'm not making a distinguishable difference with the person . . . . I'm addressing the behavior.
Francis: Okay, so it's love the saint, condemn the sinner, or condemn the sin—I'm sorry.
Ward: If that's the wording you want to use.
Francis: What wording would you use?
Ward: What I've just said. I'm not opposed to any person . . . . I believe that we are all, um, God loves us all, is what I believe.

Id. at 29:1-30:5. The panel also asked plaintiff whether she viewed her "'brand of Christianity' as superior to that of other Christians who may not agree with her, like Dr. Francis [a formerly ordained minister]." Id. at 28:6-14.

Plaintiff was informed in a March 12, 2009 letter that the panel unanimously concluded that she should be dismissed from the counseling program. A portion of the letter reads:

I am writing to convey to you the decision of the Formal Review Committee [] regarding the concerns about your behavior in COUN 686 Counseling Practicum . . . . It was the unanimous opinion of the committee that clear and convincing evidence was presented that, by your behavior, you have violated the ACA Code of Ethics . . . .

5

> Additionally, by your own testimony, you declared that you are
> unwilling to change this behavior. Your stance is firm despite
> information provided directly to you throughout your program and
> discussions you acknowledge having with faculty regarding the
> conflict between your values that motivate your behavior and those
> behaviors expected by the profession.

Plaintiff, however, believes that defendants dismissed her in part because of her expressions of her religious beliefs regarding homosexuality, as the University identified in its letter scheduling the formal review "your statements and responses to feedback about working with individual clients who identify as gay, lesbian, bisexual or transgendered delivered in COUN 571—Cross Cultural Counseling (Fall 2007 Semester); individual supervisions meetings (1/20/09 and 1/27/09); and the informal review meeting" as issues "of concern."  (Feb. 19 Letter from Dugger to Ward). Although plaintiff appealed the panel's decision to Dean Polite in a March 20, 2009 letter, arguing that she complied with the ACA Code of Ethics, the dismissal was affirmed.

As discussed *supra*, the Student Handbook requires students to conduct themselves in a manner that is consistent with University policies, including the ACA Code of Ethics.  (Handbook at 13).  Moreover, the Handbook outlines various behaviors that result in disciplinary action:

> Academic disciplinary action may be initiated when a student exhibits
> the following behavior in one discrete episode that is a violation of
> law or of the ACA Code of Ethics and/or when a student exhibits a
> documented pattern of recurring behavior which may include, but is
> not limited to . . . [u]nethical, threatening, or unprofessional conduct; .
> . . [c]onsistent inability or unwillingness to carry out academic or field
> placement responsibilities; . . . inability to tolerate different points of
> view, constructive feedback or supervision.

(Id. at 14).

6

The ACA Code of Ethics provides that a counselor's primary responsibility . . . is to respect the dignity and to promote the welfare of clients." (ACA Code of Ethics, A.1.a). The Code continues, "[c]ounselors are aware of their own values, attitudes, beliefs, and behaviors and avoid imposing values that are inconsistent with counseling goals. Counselors respect the diversity of clients . . . ." (Id. at A.4.b). Indeed, counselors are required to "actively attempt to understand the diverse cultural backgrounds of the clients they serve," (id. at Introduction) and counselor educators are encouraged to infuse multicultural/diversity competency in their training programs (id. at E.11.c). The ACA also binds counselors to comply with a nondiscrimination policy, which prohibits them from "condon[ing] or engag[ing] in discrimination based on age, culture, . . . sexual orientation, marital status/partnership . . . . Counselors do not discriminate against clients . . . in a manner that has a negative impact . . . ." (id. at C.5).

Regarding referrals, the ACA recommends that "[i]f counselors determine an inability to be of professional assistance to clients, they avoid entering or continuing counseling relationships." (Id. at A.11.b). This excerpt is consistent with the opinion of ACA Chief Professional Officer David Kaplan that "[t]here is no statement in the *ACA Code of Ethics* that referral can be made on the basis of counselor values" unless they are counseling "terminally ill clients who wish to explore options for hastening their death." Moreover, Kaplan submitted an expert report in which he agreed with the review committee's decision that plaintiff had violated the ACA Code of Ethics by imposing her own values on a client, which is "inconsistent with the counseling goal of nondiscrimination on the basis of sexual orientation." (Kaplan Expert Report, 6).

The ACA also contemplates the supervisor-counseling student relationship. Firstly, "[c]ounselors-in-training have a responsibility to understand and follow the ACA Code of Ethics and adhere to applicable laws [and] regulatory policies . . . . Students have the same obligation to clients as those required by professional counselors." (ACA Code of Ethics F.8.a). Secondly, supervisors are required to provide counseling students with feedback and appraisals of their work (id. at F.5.a); if the supervisor becomes aware of a limitation impeding the supervisee's performance, she must "assist supervisees in securing remedial assistance when needed." (Id. at F.5.b). Similarly, "[c]ounselor educators may require trainees to seek professional help to address any personal concerns that may be affecting their competency." (Id. at F.7.b). Dismissal from a training program is appropriate "when those supervisees are unable to provide competent professional services." (Id. at F.5.b).

Course textbooks offer commentary on counselor imposition of values, how to handle a values conflict, and the propriety of referrals:

> [A]void sharing a particular value you hold as a way to steer your client toward embracing your value . . . . [I]t is essential that you respect the rights of your clients to hold a different set of values . . . . We hope that there would be very few instances where you would have to tell clients that you could not work with them because you do not agree with their value system. Your job is not to judge clients' values, but to help them explore and clarify their beliefs and apply their values to solving their own problems . . . . If you find yourself struggling with an ethical dilemma over value differences, we encourage you to seek consultation. Supervision is often a useful way to explore value conflicts with clients. After exploring the issue in supervision, if you are still not able to work with a client, the ethical course of action might be to refer the client to another professional. Yarhouse and VanOrman (1999) contend that value conflicts in the therapeutic relationship are inevitable. Merely having a conflict of values does not necessarily imply the need for a referral, for it is possible to work through a conflict successfully. Challenge yourself

> to determine what it is about a client or a particular value difference
> that prompts you to want to make the referral . . . . We hope that you
> would not be too quick to refer and that you would consider a referral
> only as the last resort.

Marianne Schneider Corey & Gerald Corey, <u>Becoming a Helper</u> 222-24 (2007).  The

textbook then further contemplates how counselors should handle issues related to

homosexuality and bisexuality:

> If you hope to work effectively with these [homosexual] clients, it is
> absolutely essential that you begin by becoming aware of and
> challenging your own attitudes and assumptions about homosexuality
> and bisexuality.  It is also essential that you identify your own biases,
> challenge any myths and misconceptions that you might hold, and
> that you be open to understanding how your values regarding sexual
> orientation are likely to affect your work . . . . Helpers who may work
> with lesbian, gay, and bisexual people are ethically obligated not to
> allow their personal values to intrude into their professional work.
> Note that the ethics codes of the ACA (2005), the APA (2002) . . .
> clearly state that discrimination, or behaving differently and usually
> unfairly toward a specific group of people, is unethical and
> unacceptable.

<u>Id</u>. at 224, 226.

> On the other hand, this textbook also contains the following excerpt citing to one

2003 empirical study:

> Although helping professionals have personal values about sexual
> practices, the study found that when practitioners' beliefs conflict with
> those of clients, they appear to be able to avoid imposing their
> personal values on clients.  However, 40% had to refer a client
> because of a value conflict.  This research supports previous
> conclusions that the practice of therapy is not value free, particularly
> where sexual values are concerned.

<u>Id</u>. at 235-36.  A different textbook reads:

> In interactions with clients, it is impossible to be "value free" . . . .
> [V]alues that reflect our ideas about morality, ethics, lifestyle, "the
> good life," roles, interpersonal living, and so forth have a greater
> chance of entering the helping process.   . . .  There may be times

> when a referral is necessary because of an unresolved and interfering value conflict with a client. . . .  If you have a *major* reservation about pursuing selected goals, a referral might be more helpful to the client. . . . Referral may be appropriate in any of the following cases: if the client wants to pursue a goal that is incompatible with your value system; if you are unable to be objective about the client's concern.

Sherry Cormier & Paula S. Nurius, Interviewing and Change Strategies for Helpers: Fundamental Skills and Cognitive Behavioral Interventions 22, 266 (2003).

Plaintiff filed her Complaint on April 2, 2009, alleging that (1) defendants' disciplinary policies and codes of conduct are unconstitutional "speech codes" and infringements upon her Fourteenth Amendment Due Process rights; (2) defendants violated her First Amendment Free Speech and Free Exercise rights and retaliated against her for exercising such rights; (3) defendants violated her First Amendment right to be free of compelled speech; (4) defendants engaged in viewpoint discrimination, (5) defendants violated the Establishment Clause of the First Amendment; and (6) defendants violated her Fourteenth Amendment Equal Protection rights by dismissing her from the Program for her Christian beliefs and expressions opposing homosexual conduct.  Plaintiff asserts that she did not violate any ethical codes in referring a client and that defendants required her to affirm homosexual behavior contrary to her religious beliefs, thereafter wrongfully dismissing her when she refused to comply.  Defendants, on the other hand, allege that they did not dismiss plaintiff based on her religious beliefs, but rather that she violated the ethical codes the University decided to adopt pursuant to its broad powers to determine its curriculum. The parties have filed cross motions for summary judgment, which are presently before the court.

STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there

is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

ANALYSIS

I. Fourteenth Amendment Due Process Claim

Plaintiff characterizes defendants' disciplinary policy as a "speech code", describing it as a tool used by the University to silence unpopular, or compel favored, speech. She then challenges the disciplinary policy on its face due to overbreadth and vagueness, arguing, among other things, that the policy fails to give notice that a referral in Practicum could result in dismissal from the Program. Plaintiff's due process claim fails because the University's disciplinary policy is not a speech code but is an integral part of the curriculum.

The policy at issue, which appears in the Student Handbook, incorporates the ACA Code of Ethics, and applies to all students in the Counseling Program. In addition to being taught in counseling courses, the ACA Code of Ethics, with its nondiscrimination section, applies to students enrolled in the Program during their academic counseling activities. (Handbook Chapter 5, Departmental Student Disciplinary Policy). Contrary to plaintiff's argument, the Code of Ethics does not apply

12

to non-academic student behaviors, to which only the University Student Conduct Code, which is not at issue in this case, applies.

The Handbook sets out the Program goals and objectives in Chapter 3. As part of developing a professional identity, students are expected to gain an understanding of the ACA ethical code. (Handbook at 3.I.C). Another goal is social and cultural diversity, where "[s]tudents will be trained through coursework and experiential activities to understand the cultural context of relationships, issues and trends in a multicultural and diverse society related to the following: . .. sexual orientation, . . . counselors' roles in . . . unintentional oppression and discrimination . . ." (Handbook at 3.II).

The University, of course, did not author the ACA Code of Ethics, but in incorporating it into the Handbook, it states:

> This material will provide you with information about the principles and values upon which the counseling profession is based and about the ethics that guide our decision-making. Discussion of ethical issues will be infused throughout the COUN curriculum. It is important that you refer back to these materials frequently over the course of your studies.

(Handbook at 13). The ACA is a professional organization, and its Code of Ethics defines ethical behavior and best practices in governing the profession of counseling.

Plaintiff does not dispute that the Code of Ethics was taught in most courses, agreeing at oral argument that it was "pervasive" in the curriculum. The University is required to teach the Code of Ethics as part of its accreditation, as required by CACREP and the State of Michigan. While agreeing that the University was justified in teaching the Code of Ethics to its counseling students, plaintiff objects that the code was *enforced* against students in the program. However, the Code of Ethics itself states that it applies to counselors-in-training. (ACA Code of Ethics F.8.a).

It was Ms. Ward's understanding that referrals were permitted and even supported by the counseling profession. The ACA Code of Ethics permits referrals if a counselor determines they are not able to be of professional assistance to a client in Section A.II.B. The required textbooks provide many examples where referral is described as an appropriate option. Plaintiff wrote about instances where referral would be the proper course of action in her papers. Having learned that referral is acceptable, plaintiff contends that she should not have been disciplined for making the referral that underlies this case. The facts do not support plaintiff's argument.

The Handbook explicitly provides that an informal review is not disciplinary action:

> When a faculty member . . . has a concern about a student's academic behavior or performance . . ., the faculty member will notify the student's advisor who will then convene an informal review conference. The purpose of this meeting is not to be interpreted as disciplinary but rather as an effort to assist the student in finding ways to improve his/her performance or to explore the option of the student voluntarily leaving the program.

(Handbook at 5.B.2). Plaintiff was asked to come before a concerned faculty to discuss her behavior. However, instead of exploring options which might allow her to counsel homosexuals about their relationships, plaintiff stated that she would not engage in gay affirming counseling, which she viewed as helping a homosexual client engage in an immoral lifestyle. It was the uncompromising stance taken by plaintiff during the informal review that resulted in disciplinary action, in the form of the formal review.

The formal charges brought against plaintiff stem from the "violation and your stated intention to continue violating the ACA Code of Ethics." Plaintiff's "stated unwillingness to intentionally and competently provide counseling services to individual

clients who identify as gay, lesbian, bisexual or transgendered is not only of grave concern, but also a violation of ethical code A.1." Also referenced were statements and responses to feedback in class, supervisory meetings and during the informal review. Clearly, it was not one referral, but rather plaintiff's refusal to counsel an entire class of people that resulted in her discipline.

Statutes regulating First Amendment activities must be narrowly drawn to address only the precise evil at hand. Broadrick v. Oklahoma, 413 U.S. 601, 611 (1973). A law regulating speech is overbroad if it "sweeps within its ambit a substantial amount of protected speech along with that which it may legitimately regulate." Doe v. University of Michigan, 721 F.Supp. 852, 864 (E.D. Mich. 1989).

The caselaw propounded by plaintiff addresses campus-wide speech codes, as opposed to decisions by university administrators that a student's behavior violated curricular standards. For example, this court examined the University of Michigan's Policy on Discrimination and Discriminatory Harassment in Doe. The policy applied specifically to "[e]ducational and academic centers, such as classroom buildings, libraries, research laboratories, recreation and study centers". Id. at 856. The policy subjected people to discipline for:

> Any behavior . . . that stigmatizes or victimizes an individual on the basis of race, ethnicity, religion, sex, sexual orientation, creed, national origin, ancestry, age, marital status, handicap or Vietnam-era veteran status, and that . . . [i]nvolves an express or implied threat to an individual's academic efforts . . . or personal safety; or . . . [h]as the purpose . . . of interfering with an individual's academic efforts . . . or . . . [c]reates an intimidating, hostile, or demeaning environment for educational pursuits . . . .

Id. The anti-harassment policy was challenged in court after a student feared he could be punished for statements he wanted to make in class, and after another student was

accused of violating the policy for saying that "homosexuality was a disease" and that he was developing "a counseling plan for changing gay clients to straight."

The court stressed the constitutional protections provided to the public expression of ideas, especially in the university setting, "where the free and unfettered interplay of competing views is essential to the institution's educational mission." Id. at 863 (citations omitted). The students in Doe were threatened with punishment under the policy based on statements they made in class about their personal views. The court ultimately found that the policy was unconstitutional because it was overbroad and vague.

The Sixth Circuit analyzed the anti-discriminatory harassment policy of Central Michigan University ("CMU") in Dambrot v. Central Michigan Univ., 55 F.3d 1177 (6th Cir. 1995). The policy defined racial and ethnic harassment as:

> any intentional, unintentional, physical, verbal, or nonverbal behavior that subjects an individual to an intimidating, hostile or offensive educational, employment or living environment by . . . (c) demeaning or slurring individuals through . . . written literature because of their racial or ethnic affiliation; or (d) using symbols, [epithets] or slogans that infer negative connotations about the individual's racial or ethnic affiliation.

The court concluded that, on its face, the policy reached 'a substantial amount of constitutionally protected speech." Id. at 1182. The court was not persuaded by a statement in the policy itself that the university would not apply it in such a way as to interfere with individuals' rights to free speech. The court next considered whether the policy was "substantially overbroad and constitutionally invalid under the void for vagueness doctrine." Id. at 1183-84 (quoting Leonardson v. City of East Lansing, 896 F.2d 190, 195-96 (6th Cir. 1990)). The court concluded that the CMU policy did not

provide fair notice of what speech violated the policy, and delegated the duty to define the policy terms to university officials, and was therefore void for vagueness.

The Third Circuit permanently enjoined Temple University's sexual harassment policy as overbroad in <u>DeJohn v. Temple Univ.</u>, 537 F.3d 301 (3rd Cir. 2008). The policy was part of Temple University's Student Code of Conduct, and provided:

> For all individuals who are part of the Temple community, all forms of sexual harassment are prohibited, including . . . expressive, visual, or physical conduct of a sexual or gender-motivated nature, when . . . (c) such conduct has the purpose or effect of unreasonably interfering with an individual's work, educational performance, or status; or (d) such conduct has the purpose or effect of creating an intimidating, hostile, or offensive environment.

<u>Id</u>. at 305. The policy was challenged by a history graduate student who felt inhibited in expressing his opinions in class concerning women in combat and women in the military. The court analyzed the policy as a student free speech case, to which the overbreadth doctrine is applicable. <u>Id</u>. at 314.

In analyzing the EMU policy at issue, the court must assess whether it concerns speech, or, as argued by defendants, an academic curriculum requirement. The court must consider the University's disciplinary policy to determine if it reaches a "substantial amount of constitutionally protected speech." First, the court notes that the policy only applies to students in the counseling program. It is significant that the policy at issue is not so encompassing that it applies to all students at the University. The policy is already more narrow than those involved in <u>DeJohn</u>, <u>Doe</u> and <u>Dambrot</u>.

In the ACA Code of Ethics itself, which is incorporated into the disciplinary policy, counselors are told to "avoid imposing values that are inconsistent with counseling goals." (ACA Code of Ethics A.4.b). This is not a prohibition on a counselor making

17

statements about their values and beliefs in a setting other than with a client. This

section is quite narrowly drawn to avoid imposing harm on clients. The section of the

Code of Ethics addressing "Nondiscrimination" provides:

> Counselors do not condone or engage in discrimination based on age,
> culture, disability, ethnicity, race, religion/spirituality, gender, gender
> identity, sexual orientation, marital status/partnership, language
> preference, socioeconomic status, or any basis proscribed by law.
> Counselors do not discriminate against clients, students, employees,
> supervisees, or research participants in a manner that has a negative
> impact on these persons.

(ACA Code of Ethics C.5).

Plaintiff argues that the scope of defendants' nondiscrimination policy is so

broad, it not only includes forcing values on a client, but also judgmental thoughts,

viewing a person negatively, remaining silent in the face of discrimination, and agreeing

with something "discriminatory." Plaintiff attacks the use of the word "condone" in the

Code of Ethics and cites to Dr. Francis' deposition testimony to show that "condone" is

interpreted by the University to include agreeing with a discriminatory opinion.

> Q. . . . [T]he [nondiscrimination] provision states that counselors cannot condone
> any of these forms of discrimination. What does condone mean, within the
> context of this provision?
> A. To agree and/or promote.
> Q. Can you give me an example of improper condoning of discrimination?
> A. That I would believe that persons involved in an interracial marriage to be
> improper, immoral, and contrary to the human condition.
> Q. So if you believe that, that's an improper condoning of discrimination under
> this policy?
> A. Yes

(Francis dep. 55-56). Plaintiff argues that she did not even speak to the potential client,

yet the University concluded she violated its policies against condoning discrimination

and imposing values.

18

Courts have traditionally given public colleges and graduate schools wide latitude "to create curricula that fit schools' understandings of their educational missions." Kissinger v. Board of Trustees of Ohio State University, 5 F.3d 177, 181 (6th Cir. 1993) (citing Doherty v. Southern College of Optometry, 862 F.2d 570, 576-66 (6th Cir. 1988)). "This judicial deference to educators in their curriculum decisions is no less applicable in a clinical setting because evaluation in a clinical course 'is no less an 'academic' judgment because it involves observation of . . . skills and techniques in actual conditions of practice, rather than assigning a grade to . . . written answers on an essay question.'" Doherty, 862 F.2d at 576-77 (quoting Board of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 95 (1978) (Powell, J., concurring)). A federal court should not override a "'genuinely academic decision' . . . unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Regents of the University of Michigan v. Ewing, 474 U.S. 214, 225 (1985).

Counseling, by its very nature, relies on a uniquely personal and intimate relationship between the counselor and client to assist in delivering the objectives sought by the client. Educating counselors to provide such services is clearly within the expertise of the universities that provide such programs. Plaintiff was taught the Code of Ethics in class, and cannot claim she was unaware of its requirements. Her papers demonstrate she struggled with the issue of referral due to value conflicts, particularly when the value conflicts were due to her religious beliefs. She knew the University's curricular goal of teaching students to counsel without imposing their personal values on their clients by setting up boundaries so as not to be judgmental.

19

Plaintiff points to two other counseling students disciplined under the nondiscrimination policy. One student targeted because of her religious beliefs was subjected to an informal review conference because "the work she submitted" in the University's cross-cultural counseling class raised the "concern[] that this student would not be able to keep her religious beliefs out of her behavior with students, and that's what boundaries means, that she would not be able to keep from imposing those on the client." (Ametrano dep. 5-6). After accepting a remediation plan, the student voluntarily discontinued her studies, but she was not dismissed from the Program.

Plaintiff also refers to a third-party affidavit from former University student M.H., who plaintiff claims was punished for having a difference of opinion with Dr. Callaway regarding race. There was an informal review conference and a remediation plan involving Ms. H.:

> I suggested that your quick objections in class might reflect reliance on assimilation and that, when ideas presented do not fit in your current cognitive schema, you may reject them outright rather than explore whether you need to accommodate the new ideas by changing your cognitive schemas. Dr. Callaway suggested that you take a week to reflect upon ideas that initially seem incorrect before you assertively challenge them in class. To assist this process, Dr. Callaway suggested that you may benefit from using the strategies for disconfirming unconscious racism that are presented in the Ridley text used for the COUN 571 class.

Plaintiff argues that defendants imposed a limit on Ms. H.'s speech relative to race, causing her to self-censor her speech.

Neither of the counseling students was subjected to "discipline" for protected speech. The informal review process is not discipline under the terms of the Handbook. It is undisputed that plaintiff would not have been dismissed from the Program had she

agreed to work with the faculty to learn how to respect the boundaries between her values and her clients' values, and to counsel all clients regardless of sexual orientation:

> Q:     Is there anything that Ms. Ward could have said or done, during the formal review, that would have led you to not vote to dismiss her from the program?
> A:     Most certainly, yes.
> Q:     What is that?
> A:     That Ms. Ward was willing to work with us on a remediation plan, that would help her deal with the behavior, to learn how to deal with conflicting values and providing appropriate clinical services to people whose values she may not agree with.

(Francis dep. 100). Furthermore, plaintiff's statement that she would counsel homosexuals on non-relationship issues demonstrates her lack of understanding of the nature of counseling. Counseling is unpredictable, especially in a school setting where problems are not always apparent on their face. A counselor's job is to facilitate answers that are right for the client. Choosing particular issues that a counselor will agree to discuss with a client is not practical in the real world.

The evidence in this case supports the University's claim that the Policy is part of the curriculum. Students have notice of the Policy, both in the Handbook and as taught in most counseling classes. It is the University's prerogative to define its own curriculum, and it has given sufficient rational reasons for including the ACA Code of Ethics in its curriculum.

During the process that followed the referral in this case, plaintiff's position hardened and she expressed her unwillingness to bend. The decision to dismiss plaintiff was made after multiple attempts at testing her ability to build a barrier in values between the client and counselor. The dismissal was entirely due to plaintiff's refusal to change her behavior, not her beliefs.

The ACA Code of Ethics is the industry standard in the field of counseling. EMU did not write the nondiscrimination policy that it adopted into its counseling student handbook. Rather, the University is using the ACA Code of Ethics to govern its counseling students in exactly the same way they will be governed when they are practicing counselors. The court gives universities broad latitude when it comes to matters of pedagogy. In addition, the court should avoid entering into the role of regulating counseling industry standards.

Rather than lacking notice as she claims, plaintiff was taught counseling goals in class, they appeared in the Handbook, she wrote papers which demonstrated that she understood the issue of value differences. The classroom is where it is appropriate for students to debate and challenge issues they find difficult. Once in Practicum, students must learn, take direction, and demonstrate skills, which is impossible if they refuse to participate. The Policy in this case is part of the University's curriculum; it is not a speech code and it does not violate the Due Process Clause of the Constitution.

II. Free Speech

Plaintiff claims that defendants violated the Free Speech Clause of the First Amendment by requiring her to change her beliefs regarding homosexuality and by requiring her to express a particular viewpoint. "The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable." Wooley v. Maynard, 430 U.S. 705, 715 (1977). The "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restrictions." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829

(1995).  Plaintiff contends that defendants require their counseling students to affirm and validate homosexual relationships and behavior, and prohibit reparative therapy. Plaintiff's religious beliefs come from the Bible, and she believes that homosexual conduct is immoral.  As she explains it, "she cannot counsel a client seeking assistance with a homosexual relationship because EMU's requirement that she affirm and validate the homosexual relationship and behavior would violate her beliefs and require her to express a view that contravenes her convictions."  Furthermore, when she exercised her First Amendment right not to speak a message with which she disagreed, defendants cross-examined her and tried to change her religious beliefs.  When plaintiff did not relent, she was dismissed from the Program.

Defendants move for summary judgment, pointing out that plaintiff received "A" grades despite expressing her opposition to homosexuality; plaintiff could not identify any instance when any defendant told her they wanted her to change her beliefs; and the dismissal letter referred to plaintiff's behavior in refusing to adhere to the ACA Code of Ethics, and not her religious beliefs.

The Supreme Court considered a free speech challenge brought by high school students who were staff members of the school's newspaper, which was written and edited by a journalism class, as part of the school's curriculum.  The students objected to the deletion of several articles, based on their content, by the school principal.  The Court first recognized that "[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school."  Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) (citations omitted).  The Court held that "educators do not offend the

First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273.

"[T]he Hazelwood framework is applicable in a university setting for speech that occurs in a classroom as part of a class curriculum." Axson-Flynn v. Johnson, 356 F.3d 1277, 1289 (10th Cir. 2004) (citing inter alia as persuasive Settle v. Dickinson County Sch. Bd., 53 F.3d 152 (6th Cir. 1995)). In such context, a university's decision to compel speech will be upheld as long as the decision was "reasonably related to legitimate pedagogical concerns." Axson-Flynn, 356 F.3d at 1290 (quoting Fleming v. Jefferson County Sch. Dist. R-1, 298 F.3d 918, 926 (10th Cir, 2002) (quoting Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988)). "So long as the teacher limits speech or grades speech in the classroom in the name of learning and not as a pretext for punishing the student for her . . . religion . . . , the federal courts should not interfere." Axson-Flynn, 356 F.3d at 1293 (quoting Settle v. Dickson County School Bd., 53 F.3d at 155-56).

The Sixth Circuit held that a public school did not violate the First Amendment by refusing to allow a student to write a paper about Jesus Christ. Settle, 53 F.3d 152 (6th Cir. 1995). Concurring with the decision, Judge Batchelder wrote, "[t]his case is not about [the student's] First Amendment right to express her views, opinions or beliefs, religious or otherwise, in the classroom. This case is about whether [her] teacher may determine what topic is appropriate to satisfy a research paper assignment in that class. . . . The bottom line is that when a teacher makes an assignment, even if she does it poorly, the student has no constitutional right to do something other than that

assignment and receive credit for it."  Id.

The Ninth Circuit held that a public university can require that a student comply

with the terms of an academic assignment, without violating the First Amendment.

Brown v. Li, 308 F.3d 939 (9th Cir. 2002).  The University refused to include a copy of a

graduate student's thesis in its library because it contained a "Disacknowledgment"

section.  The court held:

> . . . under the Supreme Court's precedents, the curriculum of a public educational
> institution is one means by which the institution itself expresses its policy, a
> policy with which others do not have a constitutional right to interfere.  The
> Supreme Court's jurisdiction does not hold that an institution's interest in
> mandating its curriculum and in limiting a student's speech to that which is
> germane to a particular academic assignment diminishes as students age.
> Indeed, arguably the need for academic discipline and editorial rigor increases as
> a student's learning progresses.

Id. at 951.  Brown supports the University's position that plaintiff does not have a

constitutional right to interfere with its curriculum by demanding that she be allowed to

set her own standards for counseling clients under the faculty's State licensure in the

University's clinic.

The Tenth Circuit is consistent, applying the Hazelwood principles in a university

setting for speech that occurs in a classroom as part of a class curriculum.  "[W]e will

uphold the [university's] decision to restrict (or compel) that speech as long as [its]

decision was 'reasonably related to legitimate pedagogical concerns.'  We give

'substantial deference' to 'educators' stated pedagogical concerns.' . . . That schools

must be empowered at times to restrict the speech of their students for pedagogical

purposes is not a controversial proposition. . . . By the same token, schools also

routinely require students to express a viewpoint that is not their own in order to teach

the students to think critically. . . ." <u>Axson-Flynn</u>, 356 F.3d at 1290.

The judiciary's review of academic decisions is limited. <u>Bell v. Ohio State Univ.</u>, 351 F.3d 240, 251 (6th Cir. 2003). "When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment." <u>Ewing</u>, 474 U.S. at 225-26. To the extent EMU's decision to dismiss plaintiff was on the basis of her academic performance, the court is constrained in its review of that decision.

The University had a rational basis for adopting the ACA Code of Ethics into its counseling program, not the least of which was the desire to offer an accredited program. Furthermore, the University had a rational basis for requiring its students to counsel clients without imposing their personal values. In the case of Ms. Ward, the University determined that she would never change her behavior and would consistently refuse to counsel clients on matters with which she was personally opposed due to her religious beliefs - including homosexual relationships. The University offered Ms. Ward the opportunity for a remediation plan, which she rejected. Her refusal to attempt learning to counsel all clients within their own value systems is a failure to complete an academic requirement of the program.

Ms. Ward was enrolled in the school counseling program. In a high school setting, a counselor can expect to be presented with all sorts of issues, including homosexuality. Counseling is not an exact science; rather it is unpredictable and personal at its core. A client may seek counseling for depression, or issues with their parents, and end up discussing a homosexual relationship. A counselor who cannot keep their personal values out of the interaction has great potential to harm her client.

Referrals are taught to be a last resort because the nature of issues and topics confronting individual clients are often unforeseen. A counselor may hold himself out to specialize in a particular issue, like eating disorders, but that disorder may be due to underlying issues including, perhaps, coming to terms with their homosexuality.

All of this supports defendant's position that a counselor needs clinical educational experiences to draw upon in order to deal with situations in a non-harmful, ethically appropriate manner. Providing such skills to its graduates is the legitimate pedagogical concern of the University. EMU could not confer a counseling degree on a student who said she would categorically refer all clients who sought counseling on topics with which she had contrary moral convictions.

Having demonstrated that its Policy is reasonably related to legitimate pedagogical concerns, the University did not violate plaintiff's First Amendment free speech rights.

III. Free Exercise Clause

The Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. Courts consider whether the challenged government policy (1) is generally applicable, (2) was intended to prohibit any particular religious practice or belief, and (3) whether there exists a particularized system of exemptions. Kissinger, 5 F.3d 177.

Plaintiff contends that EMU discriminated against her because of the religious beliefs she holds. According to plaintiff, when she expressed her views in class, defendants labeled her a "homophobe" and told her she ought to consider whether EMU is a "good fit" for her. When she expressed her views in supervision session, defendant

Callaway told her that her religious views "were incompatible with the profession." When she expressed her views at the informal review conference, defendants told her that she needed to accept "remediation" to see "the error of her ways" and explained at the formal review meeting that the purpose of "remediation" was for Ms. Ward to "change[]" her "belief system". When she expressed her religious views at the formal review, defendants reiterated that her "attitudes would not be condoned" in professional counseling, questioned whether she believed homosexuality was a choice, stated that her beliefs would jeopardize client safety and comfort, inquired whether she viewed herself as "superior" to other Christians, and engaged her in a "theological bout" regarding her religious beliefs.

Plaintiff has distorted the facts in this case to support her position that defendants dismissed her due to her religious beliefs. While defendants may have been indelicate in their inquiry into Ms. Ward's beliefs, they never demonstrated a purpose to change her religious beliefs. Defendants were at all times concerned with plaintiff's refusal to counsel an entire class of people whose values she did not share. Defendants acknowledged that plaintiff's beliefs motivated her behaviors, but always made the distinction between the two, and in no way attacked her beliefs. Even plaintiff is forced to agree that Drs. Callaway and Dugger never told her she needed to change her religious beliefs. (Ward dep. 223). Still, plaintiff argues that defendants' policies are not neutral or generally applicable, and therefore they violate the Free Exercise Clause unless they can be justified by a compelling governmental interest and are narrowly tailored to advance that interest. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531-32 (1993).

In Kissinger, the Sixth Circuit held that a university graduate student's free exercise rights were not violated after the student refused to follow the university's graduate school curriculum. The plaintiff was enrolled in the veterinary graduate program and was required to complete a course in which she would be forced to operate on healthy animals. Plaintiff objected based on religious grounds and requested an alternative way to complete the course. The parties settled plaintiff's constitutional claims, and plaintiff sought attorney fees. Under §1983, a plaintiff is only entitled to attorney fees if she proves that she is "legally entitled to the redress" sought in the lawsuit. 5 F.3d at 179. The court had to decide the merits of plaintiff's free exercise claim against the university. The Sixth Circuit affirmed the district court's rejection of the plaintiff's claim because the program's curriculum "was generally applicable, was not aimed at particular religious practices, and did not contain a system of particularized exemptions." Id.

> [The plaintiff] was not compelled to attend Ohio State for her veterinary training. She matriculated there knowing that operations on live animals were part of the curriculum established by the College. She cannot now come forward and demand that the college change its curriculum to suit her desires. Courts have traditionally given public educational institutions, especially colleges and graduate schools, wide latitude to create curricula that fit schools' understandings of their educational missions. We would defeat that longstanding restraint if we ruled for [the plaintiff] today.

Id. at 180-81.

As in Kissinger, the Program's requirement that counseling students adhere to the ACA Code of Ethics is generally applicable because it applies equally to all students enrolled in the Program, and because it is a core component of the Practicum course. The Program's requirements apply to everyone equally, regardless of religion, and are

"not aimed at particular religious practices." There is no system of "particularized exemptions" by which students enrolled in the Program would be allowed to deviate from the ACA Code of Ethics in order to refer all clients whose behavior or sexual orientation they found objectionable. No students were allowed to refer clients based on their protected class, nor would they graduate without successfully completing Practicum.

Though EMU has allowed referral of clients on a limited basis, it does not have a particularized system of exemptions that allows students to graduate without meeting the curriculum requirements. Plaintiff points out that certain students were given exemptions from counseling a particular client in circumstances not involving religion. For example, a student who had recently suffered the loss of a significant person in their life was not assigned clients who were "coming in to deal with grief issues." By refusing to extend this individualized exemption to plaintiff in a case of "religious hardship", EMU is allegedly violating plaintiff's free exercise rights. However, a limited-time referral to accommodate a counselor coming to terms with personal issues is not analogous to Ms. Ward's situation. Ms. Ward wants to *always* refer *all* clients who seek counseling for sexual relationship issues she believes to be against the teachings of the Bible. This is not a limited accommodation; rather it involves the referral of all clients seeking counseling services based on the *client's* protected status.

Plaintiff also points out that a referral may be made if the parents of a homosexual child seek counseling and set the counseling goal as helping their child not engage in homosexual relationships or behavior because of their religion. Plaintiff questions why the counselor may refer a client who wants to abstain from homosexual

desires/behaviors, but does not permit referral to those like plaintiff who do not want to partake in gay-affirmative therapy.  Dr. Francis' testimony is that reparative therapy is *not the standard of care* in the profession.  However, if that is the goal the client ultimately sets, the counselor may try to help them (by referral) find someone who can help them.  Reparative therapy is not the standard of care, is not part of EMU's curriculum, and does not qualify as a particularized exemption under the Free Exercise Clause.

The ACA's Chief Professional Officer, Dr. Michael Kaplan, explained in his expert report that plaintiff's request to refer clients based on their protected status (sexual orientation) "was a clear and major violation of the ACA Code of Ethics as it also would have been if she had refused to counsel an assigned African American client on the basis that her values would not allow her to provide services to people of color." Additionally, Dr. Kaplan explained that the provision in the ACA Code of Ethics allowing referrals of clients seeking end-of-life counseling is "the exception that proves the rule" that values-based referrals based on a client's protected status are not appropriate. That is because the Code of Ethics permits *all* counselors, regardless of religious faith, to refer clients seeking counseling for end-of-life issues.

With regard to the Muslim student who was permitted to complete a required performance in front of a different group of students due to religious concerns, that student completed the academic curricular requirement.  In contrast, plaintiff made it clear that she will not perform as required going forward because she will not, under any circumstances, counsel any homosexual client about relationship issues.  Essentially,

she stated her refusal to make any effort to work with faculty to establish boundaries between her own values and the counseling relationship.

Defendants concede that the assigned text in Counseling 580 course provides that referrals based on value conflicts are permissible and sometimes in the client's best interest. Sherry Cormier & Paula S. Nurius, Interviewing and Change Strategies for Helpers: Fundamental Skills and Cognitive Behavioral Interventions 22 (2003). The text states that "value judgments by both the helper and the client may be inevitable during" the goal setting process, and that "[i]f the client selects goals that severely conflict with the helper's values or exceed the helper's level of competence, the helper may decide to refer the client . . . ." (Id. at 297).

Plaintiff wrote a paper based on the Cormier and Nurius text, wherein, with regard to referrals, she stated:

> To prevent a breakdown in the counselor client relationship, Cormer and Nurius (2003) suggest that helpers expand their awareness of clients' lifestyle choices, or belief systems that are different from their own. While this might work with less controversial issues, there are some beliefs that are not only values but convictions. For me, compromising my strong convictions for the betterment of the client would stifle my own spiritual relationship with God and prove to be a disingenuous attempt at hiding my true feelings. In situations were [sic] the value differences between a counselor and client are not amenable "standard practice' requires that the counselor refer his/her client to someone capable of meeting their needs."

Plaintiff received a perfect score on this paper. Plaintiff argues that because defendants teach that value-based referrals are permissible, it is plaintiff's religious beliefs, and not her behavior, that resulted in her dismissal from the Program.

There are excerpts from the required texts supporting both sides regarding the

referrals.  The Corey and Corey text teaches that a counselor needs to respect the values of their clients, even if they do not share them or agree with them.  Marianne Schneider Corey & Gerald Corey, <u>Becoming a Helper</u> 222 (2007).  The text acknowledges that "the therapeutic endeavor is a value-laden process and that all counselors, to some degree, communicate their values to clients."  <u>Id</u>.  However, the text cautions counseling students that in exposing the client to different values they need to be aware of how they do it so as not to influence their clients to adopt their own values.  <u>Id</u>. at 222-23.  The text acknowledges that all counselors have their own values, which will often differ from those of their clients.  The text supports EMU's curricular goal of teaching student counselors to avoid imposing their values on the client, who will often seeks approval of the counselor and pick up on non-verbal clues from the counselor.  <u>Id</u>.

In sum, plaintiff unequivocally demonstrated her unwillingness to make any effort at working within the clients' value systems when they are not in accordance with hers. By insisting on undifferentiated referral of an *entire class* of clients, plaintiff violates the ACA Code of Ethics that has been incorporated "for purely pedagogical purposes". <u>Kissinger</u>, 5 F.3d at 179. Therefore, plaintiff violated EMU's curriculum requirement that was not intended to prohibit any particular religious practice or belief. It is true that EMU's curriculum does require plaintiff to make an effort to counsel homosexual clients, but, contrary to plaintiff's assertion, this requirement is not a requirement to *endorse* or *advocate* homosexuality, hence infringing her free exercise rights. Plaintiff was not required to change her views or religious beliefs; she was required to set them aside in the counselor-client relationship – a neutral, generally applicable expectation of all

counselors-to-be under the ACA standard.

Clearly, the nondiscrimination policy is generally applicable and does not apply differently to different categories of students. There is no evidence that the purpose of the policy is to discriminate against any particular religious practice or belief. To the contrary, all evidence supports a conclusion that the purpose of the policy is to foster a positive counseling relationship, free of value judgments by the counselor. Finally, there is no "particularized system of exemptions" in place. The few exceptions, including end-of-life counseling, and a temporary exception due to grief issues, have a rational basis and do not obliterate the rule. Summary judgment is granted to defendants on plaintiff's Fee Exercise Clause claim.

IV. First Amendment Retaliation

To establish a First Amendment retaliation claim, plaintiff must demonstrate that (i) she engaged in protected conduct; (ii) an adverse action was taken against her that would deter a person of ordinary firmness from continuing to engage in that conduct; and (iii) the adverse action was motivated at least in part by her protected conduct. Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999).

Defendants seek summary judgment for the reason that plaintiff has failed to demonstrate the first element of a retaliation claim, that being that she engaged in protected conduct. Once again, plaintiff argues that the protected activity in this case was making a referral, because providing "gay-affirmative" counseling would have violated her religious beliefs. As the court has found, Ms. Ward's refusal to counsel the client in question constitutes a refusal to complete a curriculum requirement, and defendants' reasons for dismissing plaintiff are academically legitimate, rather than a

mere pretext to retaliate against her for expressing her religious beliefs.  Plaintiff was never asked to change her beliefs, only her behavior in order to complete reasonable academic requirements.

Plaintiff has failed to establish a claim for First Amendment retaliation.

V.  Rights Under the Establishment Clause

Pursuant to the First Amendment, "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend. I.  The Supreme Court has given the following broad interpretation of the Establishment Clause:

> The "establishment of religion" clause of the *First Amendment* means at least this: Neither a state nor the Federal Government can set up a church.  Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another.  Neither can . . . force him [a person] to profess a belief or disbelief in any religion.  No person can be punished for entertaining or professing religious beliefs or disbeliefs  . . . . [T]he [Establishment] [C]lause . . . was intended to erect a "wall of separation between church and State."

Everson v. Bd. of Educ. of Ewing, 330 U.S. 1, 15-16 (1947) (citation omitted).  However, subsequent cases have tempered Everson by acknowledging that church and State cannot be separate in *all* respects, as religion is a deeply embedded part of American life and culture.  See, e.g., Lemon v. Kurtzman, 403 U.S. 602, 614 (1971); Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 220 (1963) (citing Zorach v. Clauson, 343 U.S. 306, 312 (1952)).  Instead, "the touchstone for the Court's analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'"  McCreary County, Ky. v. ACLU, 545 U.S. 844, 860 (2005) (quoting Epperson v. Arkansas, 393 U.S. 97, 104 (1968)).

Establishment Clause violations are determined according to the three-pronged Lemon test. See 403 U.S. at 612-13. In order to abide by the Establishment Clause, (1) the statute must have a secular legislative purpose, (2) its principal or primary effect must be one that neither advances nor inhibits religion, and (3) it must not foster "an excessive government entanglement with religion," see id. (citations omitted). This standard has been adopted in the Sixth Circuit. See, e.g., Kunselman v. W. Reserve Local Sch. Dist., 70 F.3d 931, 932 (6th Cir. 1995); ACLU v. City of Birmingham, 791 F.2d 1561, 1563 (6th Cir. 1986); Curry v. Sch. Dist. of Saginaw, 452 F. Supp. 2d 723, 739 (E.D. Mich. 2006).

Plaintiff alleges that defendants violated the Establishment Clause by failing to maintain neutrality toward religion, by punishing plaintiff for professing her beliefs, and by failing to provide "accommodation . . . of all religions, [while] forbid[ding] hostility toward any." See Lynch v. Donnelly, 465 U.S. 668, 673 (1974). Plaintiff supports this claim by asserting that the University officials, including Drs. Francis, Callaway, and Dugger, attacked her religious beliefs, instructed her to hide her religious beliefs from her clients, and dismissed her from the Program when she refused to change her belief system.

Conversely, defendants assert that the Program comports with the Lemon test, does not favor one religion over another, and instead maintains a policy prohibiting discrimination; furthermore, they assert that plaintiff, not the defendants, seeks to inject religious concerns into the Program.

    A.    Secular Legislative Purpose

The purpose prong of the <u>Lemon</u> test inquires into the government's actual motivation underlying the regulation in question—that is, whether it was intended to advance or inhibit religion.  <u>See</u> <u>Edwards v. Aguillard</u>, 482 U.S. 578, 585 (1987).  The laws or regulations must conform to "that central Establishment Clause value of official religious neutrality."  <u>See</u> <u>McCreary</u>, 545 U.S. at 860 (citation omitted).  However, while a "totally secular purpose is not required," <u>see</u> <u>City of Birmingham</u>, 791 F.2d at 1565, there must be more than "the mere existence of *some* secular purpose," <u>see</u> <u>Lynch</u>, 465 U.S. at 690-91 (O'Connor, J., concurring) (emphasis added).  For example, the stated legislative purpose of "remind[ing] Kentuckians of the Biblical foundations of the laws of the Commonwealth" was insufficient to justify the erection of a six-foot monument bearing an inscription of the Ten Commandments on Capitol grounds.  <u>See</u> <u>Adland v. Russ</u>, 307 F.3d 471, 480-81 (6th Cir. 2002).

Defendants' curriculum has a secular purpose, as it is based upon national accreditation standards, professional codes of ethics, and State licensing requirements.  Indeed, such proscribed behaviors as "[u]nethical, threatening, or unprofessional conduct" or "[i]nability to tolerate different points of view, constructive feedback, or supervision" are certainly targeted at ensuring that students conduct themselves in a professional manner rather than at inhibiting the practice of religion.  Moreover, the Program's primary goals are threefold: (1) to promote student development, (2) to protect clients who utilize the Program's services, and (3) to serve as gatekeepers for the counseling profession, thus ensuring that its graduates have the skills and professional disposition to become licensed counselors.  (Dugger decl. ¶¶ 9-10).  In light

of the fact that the court typically gives great deference to the government's stated and sincere secular purposes, see Aguillard, 482 U.S. at 586-87 (1987), defendants' efforts to maintain such curricular policies and goals undoubtedly indicate a secular purpose, especially when compared with case law, see Lynch, 465 U.S. at 680-81 (finding a district court's decision that a creche display has no secular purpose clearly erroneous); City of Birmingham, 791 F.2d at 1565 (finding that a holiday display including a creche was not devoid of all secular purpose).

B.    The Principle Effect of Advancing or Inhibiting Religion

Justice O'Connor clarified the "effect prong" of the Lemon test as being an inquiry into "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or approval." See Lynch, 465 U.S. at 690 (O'Connor, J., concurring). O'Connor reasoned that "[e]ndorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message." Id. at 688. The court must assess, given the particular context of the situation, see id. at 690, whether the government regulation is likely to be *perceived* as an endorsement or disapproval of religion by adherents or nonadherents to a particular religion, see County of Allegheny v. ACLU, 492 U.S. 573, 597 (1989) (quoting Sch. Dist. of Grand Rapids v. Ball, 473 U.S. 373, 390 (1985)) (emphasis added), and by a reasonable observer, see id. at 620. The endorsement test has been adopted in the Sixth Circuit. See Kunselman 70 F.3d at 932; City of Birmingham, 791 F.2d at 1563; Curry, 452 F. Supp. 2d at 740.

The court finds that no reasonable person could conclude that the Program curriculum, as written or as enforced, conveys a message endorsing or disapproving of religion. Counseling program requirements that advance professionalism, tolerance, and non-discrimination, whether or not the University officials adopted an arrogant or hostile demeanor during disciplinary reviews, cannot reasonably convey a message of disapproval of religion to the public. As noted *supra*, counseling is a helping profession that seeks to assist in resolving delicate and personal issues; thus, a counselor's attitude of nonjudgment and nondiscrimination is of foremost importance. A reasonable member of the community would understand that defendants, in preparing students for the counseling profession, had a right and a duty to enforce compliance with such ethical rules. The fact that plaintiff would have to complete a remediation program to work through her values conflict in order to comply with Program requirements has no impact on the court's conclusions. The endorsement test is not violated by a government regulation that actually advances or inhibits religion, regardless of whether this is a primary or incidental effect; rather, the court must determine whether the regulation simply *communicates* a message of governmental endorsement or disapproval of religion. See Lynch, 465 U.S. at 691-92 (O'Connor, concurring).

Plaintiff argues that defendants' actions conveyed a hostile attitude toward religion and that the Establishment Clause prohibits such hostility. While she is correct in her reading of the law that hostility toward religion is prohibited, the cases she cites in support of this statement are inapposite to the instant action. See Rosenberger, 515 U.S. at 845-6; McDaniel v. Paty, 435 U.S. 618, 636 (1978) (Brennan, J., concurring).

First, these cases dealt with hostile *laws and regulations* violating the Establishment Clause*, see* Rosenberger, 515 U.S. at 822; McDaniel, 435 U.S. at 620; here, however, plaintiff claims that defendants' hostile *attitudes* during enforcement of Program policies are unconstitutional.  Second, in both Rosenberger and McDaniel, the regulations at issue facially discriminated on the basis of religion, see Rosenberger, 515 U.S. at 822; McDaniel, 435 U.S. at 620, while the regulation in the instant case is facially neutral regarding religion.

      C. Excessive Entanglement With Religion

      In determining whether there is an excessive entanglement with religion, the court must analyze "the character and purpose of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority."  See Lemon, 403 U.S. at 615.  First, the court looks to whether there is any administrative relationship or interaction between church and State.  See Lynch, 465 U.S. at 684; City of Birmingham, 791 F.2d at 1565-66.  Second, the court must assess the degree of political divisiveness legislation or regulations may cause, as "political division along religious lines was one of the principal evils against which the *First Amendment* was intended to protect."  See Lemon, 403 U.S. at 622-23.  Political divisiveness alone, however, is insufficient to invalidate otherwise permissible government conduct.  Lynch, 465 U.S. at 684; City of Birmingham, 751 F.2d at 1565.   Moreover, the lawsuit in question cannot be exploited to create the appearance of political dissention and, consequently, entanglement.  Lynch, 465 U.S. at 685-86.

Given that the curriculum requirements and codes of professional behavior are undoubtedly secular in nature, defendants are unlikely to be compelled to have any administrative relationship or interactions with representatives of religious organizations. Indeed, the University's curriculum is far more secular and neutral toward religion than a holiday display that includes a creche.  See id. at 684 (holding there to be no religions entanglement since no evidence existed that there had been contact between the government and church authorities regarding the content or design of the exhibit).  A finding of excessive entanglement is more appropriate in situations, for example, where the government provides salary supplements to teachers of secular subjects in schools with religious affiliations.  See Lemon, 403 U.S. at 617-19 (reasoning that the government's duty to ensure that the teachers receiving salary supplements refrained from injecting religion into their lessons would create an unacceptable degree of administrative interaction with the church).

Likewise, there is no evidence that the curriculum or enforcement of the curriculum has caused any political divisiveness.  Defendants have never experienced a similar dispute regarding their curriculum; indeed, Dr. Ametrano stated in her twenty-nine years of teaching, no student has ever refused to counsel a client.  (Ametrano dep. 45:2-6).  In fact, Dugger has stated that "the Program has educated and graduated many students with strong religious (including Christian) backgrounds and beliefs." (Dugger decl. ¶ 22).  In another example, a former counseling student who expressed racially discriminatory comments during class accepted a remediation plan in order to

work through these conflicts.  (H. Aff. ¶¶ 36-37).  Thus, the curriculum requirements at issue here do not require excessive entanglement with religion for enforcement.

    D.    <u>Religion of Secularism</u>

Where a plaintiff challenges religiously neutral laws and regulations on Establishment Clause grounds, the claim is better characterized as an allegation that the defendants have established a "religion of secularism."  <u>See</u> <u>Schempp</u>, 374 U.S. at 225 (holding that the State may not establish a "religion of secularism"); <u>Torcaso v. Watkins</u>, 367 U.S. 488, 495 n.11 (1961) (assuming without deciding that non-theistic beliefs such as secular humanism are "religions" for purposes of the First Amendment). Although plaintiff did not specifically allege that defendants have established a religion of secularism, their argument may be read to imply this claim, and so it will be addressed by the court.

A regulation may be found to establish a "'religion of secularism' in the sense . . . [that it] affirmatively oppos[es] or show[s] hostility to religion, thus 'preferring those who believe in no religion over those who do believe.'"  <u>Schempp</u>, 374 U.S. at 225 (quoting <u>Zorach</u>, 343 U.S. at 314).  The Ninth Circuit has defined "secular humanism" in such a way that a religion of secularism is not established unless the government (1) actively demonstrates hostility toward religion, consistent with <u>Schempp</u>, <u>see</u> 374 U.S. at 225, or (2) lends support to particular secular humanist organizations, <u>see</u> <u>Grove v. Mead Sch. Dist. No. 354</u>, 753 F.2d 1528, 1537 (9th Cir. 1985) (citing <u>Malnak v. Yogi</u>, 592 F.2d 197, 296, 212 (3d Cir. 1979) (Adams, J., concurring)).  Moreover, the majority in <u>Schempp</u> rejected the notion that governmental efforts to maintain neutrality toward religion

establish a religion of secularism and thereby violate the Establishment Clause.  <u>See</u> 374 U.S. at 225-26.

Although plaintiff's complaint that defendants demonstrated hostility, arrogance, and offensiveness during the formal and informal reviews is well taken, the court finds that neither this behavior nor the curriculum requirements satisfy the level of hostility required to establish a religion of secularism under <u>Schempp</u>.  Defendants' disrespectful comments were directed at plaintiff, herself, rather than at the practice of religion; there was no affirmative or willful denigration of orthodox Christianity, but rather tactless questioning assessing whether plaintiff could comply with Program policies.  Therefore, defendants' treatment of plaintiff is no doubt insufficient to constitute a religion of secularism. The Program curriculum, itself, attempts to foster an atmosphere of neutrality through policies that prohibit discrimination "based on age, culture, disability, ethnicity, race, *religion/spirituality*, gender, gender identity, [and] sexual orientation . . ." (ACA Code of Ethics C.5 (emphasis added)).  Clearly, the Program was designed to encourage respect for, not hostility toward, various points of view.  Additionally, there is no allegation or evidence that defendants support specific organizations dedicated to the cause of advancing secularism.

It is relevant to note that no case has ever found the government to have violated the Establishment Clause by endorsing a religion of secularism.  103 A.L.R. Fed. 538, *2 (2008).  For example, when individuals have protested teaching evolution, these claims, like plaintiff's, have failed based on the curriculum's neutrality toward religion.  <u>See</u> <u>Wright v. Houston Indep. Sch. Dist.</u>, 366 F. Supp. 1208, 1210 (S.D. Tex. 1972); <u>see</u>

also Cornwell v. State Bd. of Educ., 314 F. Supp. 340, 344 (D. Md. 1969) (sex education); Smith v. Bd. of Sch. Comm'rs., 827 F.2d 684, 690 (11th Cir. 1987) (history without sufficient reference to religion).

Plaintiff fails to demonstrate sufficient evidence to meet her burden of proof at trial for the Establishment Clause claim. Whatever hostility or inhibition of religion the Program curriculum (and University officials) created is far too attenuated to be considered Establishment Clause violations. See Estate of Thornton v. Caldor, 472 U.S. 703, 710 (1985) (holding that in terms of finding Establishment Clause violations, courts are unconcerned with "incidental or remote effects of advancing [or inhibiting] religion").

VI.     Equal Protection

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," meaning that all persons similarly situated should be treated alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). In general, the initial discretion to determine what is "different" or "similar" resides in the legislative body. Plyler v. Doe, 457 U.S. 202, 216 (1982). However, the general rule gives way when a statute or government regulation classifies people by race, alienage, or national origin. In addition, similar oversight by the courts is due when the state impinges on personal rights protected by the Constitution. City of Cleburne, 473 U.S. at 440. The Supreme Court has found that the following rights are fundamental: the right to vote, the right to interstate travel, the rights guaranteed by the First Amendment, and certain rights which are uniquely private in nature. Sturgell v. Creasy, 640 F.2d 843, 852 (6th Cir. 1981).

When such a fundamental right is substantially infringed, federal courts subject the law to strict scrutiny.  Id. at 853.  Then, the state has the burden to prove its classification is precisely tailored to serve a compelling governmental interest.  Plyler, 457 U.S. at 216.

Plaintiff's argument for strict scrutiny in her equal protection claim hinges largely on her underlying Free Exercise Clause claim.  Free exercise of religion is a fundamental right under the First Amendment, and whether plaintiff succeeds in this respect determines the level of scrutiny under the Equal Protection Clause.  As analyzed in Part III, plaintiff does not succeed on her free exercise claim, because EMU's curriculum regulations are religiously neutral and do not contain a particularized system of exemptions.  None of the referral cases that the plaintiff has mentioned involve the kind of systematic class exclusion plaintiff invoked based on the client's protected status.  Because EMU's policy does not violate plaintiff's free exercise rights, the court applies a rational basis test for plaintiff's equal protection claim.

If a law or government regulation simply aims to serve a social or economic purpose, the Equal Protection Clause allows the state wide latitude.  City of Cleburne, 473 U.S. at 440.  If the plaintiff claims that she has been singled out for discriminatory treatment as a "class of one", she has the burden to prove that the state did so without rational basis.  She may satisfy her burden of proof either by negating "every conceivable basis" that might support the government action or by showing that the government was motivated by animus or ill will.  TriHealth Inc. v. Bd. of Comm'r, 430 F.3d 783, 788 (6th Cir. 2005).  Other circuit courts have phrased the rational basis test in slightly different ways, but they all hold that the state should be given wide discretion,

unless the law is obviously motivated by malicious intent to discriminate.  <u>See</u>, <u>e.g.</u>, <u>LeClair v. Saunders</u>, 627 F.2d 606, 609 (2nd Cir. 1980).

Under the rational basis test, distinctions made by the law must be relevant to the legislative purpose, and must be material.  In <u>City of Cleburne</u>, the Supreme Court held that a zoning ban on mental health group homes was unconstitutional because the mentally disabled did not pose any special safety threat to the community as compared with patients in other nursing homes.  The distinction was unconstitutional because it lacked any reasonable relationship to the legislative purpose.  <u>City of Cleburne</u>, 473 U.S. at 448.  The materiality of the distinction is "an integral element" of the rational basis inquiry: disparate treatment of persons who are dissimilar only in immaterial respects is not rational; conversely, disparate treatment of persons is reasonably justified if they are dissimilar in some material respect.  <u>TriHealth Inc.</u>, 430 F.3d at 788.

EMU's regulation is reasonably related to the legitimate pedagogical goal of maintaining a rigorous counseling program, thus it would pass the rational basis test.  In order to maintain accreditation through CACREP, EMU needs to adhere to the ACA and ASCA Ethics Codes.  Plaintiff does not dispute EMU's claim that CACREP accreditation is "integral" to maintaining the counseling program's caliber.  As an educational institution, setting and maintaining educational standards is a legitimate goal; and adherence to the Ethics Codes is a reasonable means to further this goal.  Since the Ethics Codes require the student to build a boundary between their personal values and the conducts of their clients, EMU was acting in accord with its pedagogical goal to discipline students who failed to do so.  Defendants did offer plaintiff the option of a remediation program *to change her professional conduct*, which, had plaintiff chosen to

accept it, would have led to plaintiff obtaining her degree. Defendants correctly point out that plaintiff failed to identify a materially similar case: neither the student who was permitted a temporary referral due to personal trauma nor the Muslim student who completed her academic requirement under accommodation was "similarly situated" with plaintiff in relation to the school's pedagogical goals, since neither of them failed to fulfill academic requirements.

Though there were some unfriendly and arrogant remarks during the formal hearing after plaintiff's refusal to participate in remediation, there was no evidence that the defendants maliciously singled out plaintiff from among other similarly situated individuals for discriminatory treatment as a "class of one". Plaintiff has been a student with excellent academic credentials, and her work earned repeated approval from the faculty members – even when she expressed potential difficulties in following the ACA Code of Ethics due to religious reasons in her papers - *until* she explicitly refused to comply with the academic requirements of the Practicum. Both sides' positions eventually hardened due to the confrontational atmosphere, culminating in the "theological bout" during the formal hearing. Nevertheless, the court does not perceive any maliciousness in defendants' behavior amounting to a constitutional violation. Plaintiff's Equal Protection Clause claim, analyzed under the rational basis standard is without merit.

This court finds that even if plaintiff succeeded in her free exercise claim, resulting in strict scrutiny review of her equal protection claim, defendants have demonstrated a compelling interest and narrowly tailored means to achieve the end. The Supreme Court has recognized the "fundamental role" of public education in

"maintaining the fabric of our society".  Plyler, 457 U.S. at 221.  Therefore, public

educational institutions have been given considerable deference by the judiciary in

determining their own academic standards.  Some courts have held that a compelling

interest in public education includes designing and teaching a curriculum as the State

sees fit.  See, e.g., Fields v. Palmdale Sch. Dist., 427 F.3d 1197 (9th Cir. 2005), Parents

Involved in Cmty. Sch. v. Seattle Sch. Dist., 285 F.3d 1236 (9th Cir. 2002).  EMU has a

compelling interest to design and maintain a counseling program meeting the CACREP

accreditation standard, and its measure to enforce this goal is narrowly-tailored: it is not

so under-inclusive that it only targets plaintiff's religion, nor is it so over-inclusive that it

substantially regulates aspects of students' personal lives outside of their professional

conduct.  Therefore, defendants would still obtain summary judgment on the equal

protection claim even if plaintiff had succeeded on the free exercise claim.

## CONCLUSION

For the reasons stated in this Opinion and Order, summary judgment is granted

in favor of defendants and against plaintiff.

Dated:  July 26, 2010

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
July 26, 2010, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk